UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARCELL YOUNG,

                Plaintiff,

    v.

ANDREW SAUL,

                Defendant.

Case No.  19-cv-01965-PJH

**ORDER GRANTING PLAINTIFF'S MOTION AND REMANDING FOR FURTHER PROCEEDINGS**

Re: Dkt. Nos. 16, 17

Pursuant to 42 U.S.C. § 405(g), plaintiff Marcell Young ("plaintiff") seeks judicial review of the Commissioner of Social Security's ("Commissioner" or "defendant") final decision denying his claims for disability benefits and Supplemental Security Income ("SSI").  This action is before the court on the parties' motions for summary judgment. Having considered the parties' motions, the pertinent legal authorities, and having reviewed the administrative record, the court **GRANTS** plaintiff's motion and hereby **REMANDS** this action to defendant's assigned administrative law judge for further proceedings in accordance with this order.

**BACKGROUND**

**A.    Procedural History**

On May 18, 2015, plaintiff filed two applications—one for Title II disability benefits and one for Title XVI SSI benefits—both alleging disability as of May 14, 2015. Administrative Record ("AR") 235–47, Dkt. 13.  Defendant denied plaintiff's Title II and Title XVI claims at the initial level on October 18, 2015 and October 20, 2015 respectively (id. at 100–01) and at the reconsideration level as to both claims on May 26, 2016.  Id. at

1   132–33.  Following a timely request for a hearing, Administrative Law Judge Arthur

2   Zeidman (the "ALJ") held a hearing on plaintiff's claims on December 13, 2017.  Id. at 17.

3   At the hearing plaintiff and a vocational expert, Susan Moranda, testified.  Id. at 67–69.

4        On April 2, 2018, the ALJ issued his decision on plaintiff's application and

5   concluded that plaintiff was not disabled within the meaning of the applicable Social

6   Security laws and regulations.  Id. at 17–30.  Plaintiff filed a request for review of the

7   decision with the Social Security Appeals Council, which denied review on February 13,

8   2019.  Id. at 233–34.

9   **B.     Summary of Plaintiff's Medical and Employment History**

10       Plaintiff is a 27-year-old resident of Alameda County.  As a child, plaintiff was

11  diagnosed with borderline intellectual functioning and received SSI due to his impaired

12  intellectual functioning.  Id. at 283.  Plaintiff was enrolled in special education classes

13  throughout his schooling years as his borderline intellectual functioning manifested in low

14  basic reading ability, auditory processing deficiencies, and frequent truancy.  Id. at 708.

15  In 2009, when he was 15 years old, plaintiff was involuntarily committed to inpatient

16  mental health treatment at Mills-Peninsula Health Services because he was threatening

17  family members and punched a hole in the wall.  Id. at 924.  Plaintiff was also twice

18  arrested and placed in the juvenile justice system.  During that time, he graduated high

19  school and received his diploma from a residential facility in Nevada in March 2011.  Id.

20  at 326.  In November 2011, plaintiff (then 18 years old) was seen by Dr. Cecilia Hardey,

21  Ph.D. for a re-evaluation of his SSI benefits.  Dr. Hardey administered the Wechsler Adult

22  Intelligence Scale–IV ("WAIS–IV") test resulting in a full scale IQ of 71.  Id. at 757.

23  Plaintiff's scores generally placed him in the borderline range of intellectual functioning,

24  which Dr. Hardey diagnosed plaintiff as having.  Id. at 757.  However, plaintiff's Social

25  Security Administration ("SSA") disability examiner assessed that plaintiff no longer was

26  disabled.  Id. at 81, 774–75.

27       From 2011 to 2012, plaintiff worked for brief periods of time in various positions

28  earning near minimum wage for unskilled work.  Id. at 269–71, 314–17, 412.  Plaintiff

United States District Court
Northern District of California

United States District Court
Northern District of California

1  found longer term employment with the U.S. Postal Service as an assistant mail handler

2  from December 2012 to January 1, 2015.  Id. at 611, 619, 623.  According to plaintiff's

3  mother, during this period in time, plaintiff was able to live on his own, manage his own

4  money, and had a girlfriend.  Id. at 636.

5       Plaintiff states that beginning in early 2015 he began experiencing auditory

6  hallucinations and paranoia causing him to leave his apartment and end his employment

7  with the postal service.  Id. at 891–901, 635–39.  Plaintiff's mother discovered plaintiff to

8  be homeless and brought him to the Sausal Creek Outpatient Stabilization Clinic ("Sausal

9  Creek") for treatment.  Id. at 891–901, 635–39.  At his intake on May 15, 2015, plaintiff

10 was diagnosed with schizophrenia and prescribed Zyprexa, a drug used to treat mental

11 disorders.  Id. at 891, 895.  Plaintiff continued to seek treatment at Sausal Creek where

12 he was seen by various providers.  Id. at 891–901.  Sausal Creek providers assessed

13 plaintiff's global assessment function ("GAF") scores[1] to be 49 (May 26, 2015 by Dr. Paul

14 Nichfarm, M.D.), 51 (October 9, 2015),[2] and 55 (November 17, 2015 by Dr. James

15 Reichmuth, M.D.).  Id. at 904, 909, 914.

16      In September 2015, plaintiff was evaluated by Dr. Shephali Gupta, Psy.D. on a

17 referral from the SSA.  She administered the WAIS-IV test and found plaintiff's full scale

18 IQ to be 81.  Id. at 806.  Dr. Gupta diagnosed plaintiff with psychotic disorder (not

19 specified), assessed a GAF of 60, and found mild or mild-to-moderate work limitations.

20 Id. at 808.  On October 8, 2015, plaintiff visited the Highland Wellness Clinic and was

21 seen by Dr. Andrew Lash, M.D., who diagnosed plaintiff with psychosis and provided

22 plaintiff with a Zyprexa refill script.  Id. at 850–55.  Dr. Lash noted that plaintiff said he

23 had "[n]o voices, no visual hallucinations" and he "[s]leeps well."  Id. at 850.  On October

24

25 [1] "A GAF score is a rough estimate of an individual's psychological, social, and
   occupational functioning used to reflect the individual's need for treatment. . . . According

26 to the [Diagnostic and Statistical Manual of Mental Disorders, 4th Edition ("DSM–IV")], a
   GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment

27 in social, occupational, or school functioning.'  A GAF score between 51 to 60 describes
   'moderate symptoms' or any moderate difficulty in social, occupational, or school

28 functioning."  Garrison v. Colvin, 759 F.3d 995, 1003 (9th Cir. 2014).
   [2] The signing physician's name is illegible.  AR 914.

18, 2015, the SSA referred plaintiff's case to Dr. Paul Klein, Psy.D., who evaluated plaintiff's medical record, including Dr. Gupta's medical opinion, and opined that plaintiff was mildly impaired in some work-related abilities.  Id. at 87.  The same month, plaintiff was arrested for vandalism and received a mental status health examination at Santa Rita Correctional Facility on October 29, 2015.  The evaluation by Leonicia Castro, MFT concluded that plaintiff appeared "in the early stages of a psychotic break" and had "poor insight and judgment, poor understanding of his mental illness."  Id. at 888.

From November 2015 until February 2016, plaintiff received treatment at Bay Area Community Services ("BACS"), including medication and case management and therapy with BACS.  Id. at 810–918, 974–1047.  BACS's non-physician clinicians noted various degrees of severity of plaintiff's condition.  For example, one unlicensed worker noted that plaintiff was in a "good" mood and "engaged well" with her.  Id. at 984.  Yet, in December 2015, plaintiff's Zyprexa prescription was increased from 5mg to 7.5mg after plaintiff reported continuing auditory hallucinations.  Id. at 978, 1002.  In February 2016, Dr. Fred Phillips, M.D., noted that plaintiff "has problems with concentration due to aud[itory] hallucinations.  Hallucinations are persecutory but not presently bothersome."  Id. at 979.

BACS referred plaintiff to the Felton Institute's Prevention and Recovery in Early Psychosis ("PREP") program in February 2016.  During his time at PREP, three successive therapists managed plaintiff's care: Christina Shinn, MFT, from April 2016 until approximately late June or mid-July 2016 (id. at 1335–36, 1288); Louije Kim, MFT, from July 2016 until late March or early April 2017 (id. at 1252, 1366, 1390–91); and Teresa Shepard, LMFT through the remainder of 2017.  Id. at 1390–91, 1433–34.  Each of plaintiff's PREP therapists (Shinn, Kim, and Shepard) met with plaintiff, either in person or by phone, on a weekly basis.  See generally id. at 1149–445 (encounter notes produced by PREP)  During plaintiff's entire duration at PREP, K. Lu Gilligan, N.P., a psychiatric nurse practitioner, met with plaintiff on a bi-weekly or monthly basis to evaluate his symptoms, manage his care, and adjust his prescriptions.  See, e.g., id. at

4

1349–50.

In May 2016, a psychiatrist hired by the SSA, Dr. Norman Zukowsky, Ph.D., conducted a reconsideration of Dr. Klein's opinion.  He examined plaintiff's medical record, including Dr. Gupta's opinion, and determined that plaintiff had moderate limitations in ability to maintain attention and concentration for extended periods.  He opined that plaintiff could "make basic decisions independently, as well as avoid common hazards" and that plaintiff "can adapt adequately to typical workplace stresses and changes." Id. at 114.

Plaintiff's intake assessment with PREP did not occur until June 16, 2016.  At the intake, plaintiff's mother related to Shinn that plaintiff still talked to himself, isolated himself, and rejected family interaction.  Id. at 1151.  Shinn also noted that plaintiff had "punched his brother without provocation several months ago." Id. at 1152.  Shinn determined that plaintiff was eligible for PREP services and diagnosed him with schizophrenia, paranoid type. Id. at 1154.  Plaintiff had several encounters with his PREP therapist as well as structured group therapists around this time and, on June 28, 2016, Shinn again assessed plaintiff as having schizophrenia and an unspecified intellectual disability.[3] Id. at 1404.  She also assigned plaintiff a GAF of 45. Id. at 1405.

On August 19, 2016, Kim reported that plaintiff participated in a therapy session but "appeared bored at points, evidenced by wandering gaze and speaking minimally when prompted." Id. at 1366.  He "appeared unaffected by praise and encouragement; he neither smiled nor verbally responded to praise, though he would nod in agreement occasionally." Id.  On September 12th, Kim noted that plaintiff "was wide-eyed and staring into space.  He was internally preoccupied and endorsed hearing multiple voices throughout session." Id. at 1363.  Plaintiff was "undertalkative, replied to prompts using single words or sentences.  Affect was blunted." Id.  Plaintiff reported that "his voices

---

[3] The assessment diagnosed an unspecified "mental retardation."  The court uses the term "intellectual disability," which is the current medical term used to describe the same phenomenon.  See Hall v. Florida, 572 U.S. 701, 704–05 (2014) (describing change from "mental retardation" to "intellectual disability").

1    were at a '7' out of 10 in severity and that he would like to go to the hospital if they reach

2    a '10.'"  Id.  That same day, Gilligan reported that she received a call from Casa staff (see

3    discussion of Casa below), "who reported [plaintiff] was symptomatic over the weekend,

4    and was paranoid and required staff accompany him at night."  Id. at 1362.  Plaintiff

5    "reported an increase in hallucinosis and paranoia, stating that multiple voices were

6    intrusive and that he had grown fearful over the past week."  Id.  Gilligan also increased

7    plaintiff's Zyprexa dosage and started him on Risperdal, a different antipsychotic

8    medication.  Id.

9         On October 10th, Kim reported that plaintiff "was subdued, dysphoric, and

10   guarded.  His grooming and hygiene were at baseline.  [Plaintiff's] eye-contact was

11   downcast, poor.  He was undertalkative, though more forthcoming than previous

12   presentations."  Id. at 1357.  Kim observed similar behavior two days later (id. at 1356)

13   and on October 17th, Gilligan reported that plaintiff stated "that multiple voices were still

14   present, and then asked for an increase in Risperdal."  Id. at 1354.  Gilligan "made sure

15   staff understood the severity [plaintiff's symptoms]."  Id.  However, plaintiff appeared to

16   improve because in December 2016, Gilligan noted that plaintiff "reported that the

17   multiple voices and the paranoid ideation were in remission with the increase in

18   Risperdal."  Id. at 1339.

19        By early 2017, plaintiff's providers recorded some positive encounters.  For

20   example, on March 31, 2017, Gilligan and one of plaintiff's other providers "agreed

21   [plaintiff] was doing exceptionally well, as he is now working full-time again at [the] Post

22   Office.  Also, he's still med-compliant."  Id. at 1392.  Shepard also noted some

23   improvement, for example, on May 12, 2017, she recorded that plaintiff "was upbeat

24   during this meeting."  Id. at 1387.  Then, on June 16, 2017, Shepard reported that

25   plaintiff's brother was killed by a gunshot and plaintiff had been laid off at the Postal

26   Service.  Id. at 1386.  On June 26th, she reported that plaintiff's "mood was 'fine' and

27   denied having hallucinations."  Id. at 1385.

28        On July 4, 2017, Shepard recorded plaintiff's one year assessment.  She noted

6

that plaintiff "has periodically reported increase in depressive and psychotic symptoms (most recently in March 2017) which have been controlled by medication." Id. at 1426. Plaintiff continued to receive mixed reports.  For example, on September 15, 2017, a PREP group therapist noted that plaintiff was not sleeping well and continued to struggle with depression.  Id. at 1437.  On October 4, 2017, Shepard reported that plaintiff denied symptoms of psychosis and sleep disturbance, though she also noted that plaintiff "reported a 2-week period of increase depression and intrusive thoughts around death of [his] brother." Id. at 1434.

At the same time as his spring 2016 referral to PREP, plaintiff was homeless.  In June 2016, his PREP treatment team found him housing at Casa de la Vida ("Casa"), a living facility with case management, group therapy, and skills workshops.  Id. at 1318, 1119–48.  On July 23, 2016, Shepard—using a check-the-box assessment form and co-signed by Dr. Amanda Beth Elder, Psy.D.—assessed plaintiff as having severe functional impairments in activities of daily living, unable to independently meet his needs for food and shelter, and experiencing severe episodes of decompensation and increase of symptoms.  Id. at 1131.  Shepard assessed that plaintiff met two criteria for Casa residency: "significant impairment in an important area of life" and "probability of significant deterioration in an important area of functioning."  Id.  She noted that plaintiff's current GAF score was 45, which was determined on June 15, 2016 by a PREP therapist.  Id. at 1132.

Plaintiff failed to pay his rent at Casa in October 2016 resulting in him moving into a different living facility, Turning Point.  Id. at 1352.  On October 31, 2016, Dr. Elder and Shepard issued a discharge summary for plaintiff in which they opined that plaintiff "adhered to medications, adjusted to a couple medication changes with his prescriber, and stabilized his mental health."  Id. at 1119.  He also "often engaged in pro-social activities, playing basketball and walking in the community with peers."  Id. at 1119.  They diagnosed plaintiff with schizophrenia and assessed his GAF as 45.  Id. at 1120.

During the period from April 2016 to October 2017, plaintiff attempted various

1  employment opportunities. Id. at 264–65.  He worked at Save-Mart in April 2016, for two

2  weeks until he was terminated for job abandonment.  In May 2016, he was hired by Wal-

3  Mart but then fired within two weeks for excessive absences.  The most notable

4  employment period was from November 21, 2016 to January 6, 2017 and again from

5  February 13, 2017 to June 2017 at the U.S. Postal Service.  It appears that both

6  employment periods ended because the position with the Postal Service was temporary,

7  seasonal work. Id. at 1378, 1397–98.  In October 2017, plaintiff started a vocational skills

8  program called CEO Works.  As part of this program, plaintiff worked about three days a

9  week collecting trash for which he earned approximately $76 per day. Id. at 52–53.

### STATUTORY AND REGULATORY FRAMEWORK

**A.    Five-Step Sequential Analysis**

12         The Social Security Act provides for the payment of disability insurance benefits

13  and supplemental security income to people who suffer from a qualifying physical or

14  mental disability.  42 U.S.C. §§ 423(a)(1), 1382.  To evaluate whether a claimant is

15  disabled within the meaning of the Social Security Act, the ALJ is required to use a five-

16  step sequential analysis.  20 C.F.R. § 416.920(a).[4]  The ALJ may terminate the analysis

17  at any step if he or she determines that the claimant is or is not disabled. Pitzer v.

18  Sullivan, 908 F.2d 502, 504 (9th Cir. 1990).

19         At step one, the ALJ determines whether the claimant has engaged in any

20  "substantial gainful activity," which would automatically preclude the claimant receiving

21  disability benefits.  20 C.F.R. § 416.920(b).  If the claimant has not engaged in substantial

---

[4] A claimant who is disabled and has contributed to the Social Security program may be eligible for disability insurance benefits under 42 U.S.C. § 401 et seq. and the corresponding regulations located at title 20 Code of Federal Regulations Part 404—a Title II claim.  A claimant who is disabled with limited financial resources may be eligible for supplemental security income under 42 U.S.C. § 1382 et seq. and the corresponding regulations located at title 20 Code of Federal Regulations Part 416—a Title XVI claim.  The regulations located at 20 C.F.R. § 416.900 et seq. and 20 C.F.R. § 404.1500 et seq. are essentially identical and the two trailing digits in one part correspond to the trailing digits in the other part.  Plaintiff has filed both a Title II and Title XVI and thus both regulations are applicable to his claims.  For ease of reference, the court only refers to the SSI regulations, i.e., 20 C.F.R. § 416.900 et seq.

8

gainful activity for a continuous 12-month period, at step two, the ALJ considers whether the claimant suffers from a severe impairment which "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). If the claimant does not suffer from a severe impairment, he is not disabled. If, however, he does have a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ is required to compare the claimant's impairment(s) to a listing of impairments provided in an appendix to the regulations. 20 C.F.R § 416.920(a)(4)(iii), (d). If the claimant's impairment or combination of impairments meets or equals the severity of any medical condition contained in the listing, the claimant is presumed disabled and should be awarded benefits. 20 C.F.R. § 416.920(d).

If not, the ALJ goes to step four to consider whether the claimant has sufficient residual functional capacity ("RFC") to perform his past work despite the limitations caused by the impairments. 20 C.F.R. § 416.920(e)–(f). An individual's RFC is what he can still do in a workplace setting despite his physical and mental limitations. 20 C.F.R. § 416.945. In determining the RFC, the ALJ must consider all of the claimant's impairments, including those that are not severe, taking into account all relevant medical and other evidence. 20 C.F.R. §§ 416.920(e), 416.945. If the claimant cannot perform his past work, defendant is required to determine, at step five, whether the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's RFC, age, education, and work experience. 20 C.F.R. § 416.920(g).

At steps one through four, the claimant has the burden to demonstrate a severe impairment and an inability to engage in his previous occupation. Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995). If the analysis proceeds at step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other work. Id. The Commissioner must "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [his] identified limitations. Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (citing Johnson v. Shalala, 60 F.3d 1428,

1   1432 (9th Cir. 1995)).  If the Commissioner is able to identify those specific jobs, then the

2   claimant is not disabled; otherwise, the claimant is disabled.  20 C.F.R. § 404.920(g)(1).

3   **B.     Supplemental Regulations for Determining Mental Disabilities**

4          In addition to the general five-step evaluation process, the Commissioner has

5   promulgated regulations governing the evaluation of mental impairments applicable at

6   steps two and three of the five-step process.  See 20 C.F.R. § 404.920a; see also

7   Achakzai v. Berryhill, No. 18-CV-07005-JCS, 2020 WL 1450554, at *11 (N.D. Cal. Mar.

8   25, 2020) (citing Clayton v. Astrue, No. CIV 09-2282-EFB, 2011 WL 997144, at *3 (E.D.

9   Cal. Mar. 17, 2011); and Maier v. Comm'r of Soc. Sec. Admin., 154 F.3d 913 (9th Cir.

10  1998) (per curiam)).  First, the ALJ must determine whether the claimant has a medically

11  determinable mental impairment.  20 C.F.R. § 404.920a(b)(1).  Second, when the

12  claimant establishes these medical findings, the ALJ "must assess the degree of

13  functional limitation resulting from the claimant's mental impairment with respect to four

14  broad functional areas: (1) understanding, remembering, or applying information; (2)

15  interacting with others; (3) concentration, persistence, or maintaining pace; and (4)

16  adapting and managing oneself."  Achakzai, 2020 WL 1450554, at *11 (citing 20 C.F.R.

17  § 404.1520a(b)(2), (c)).  Third, the ALJ then determines whether the claimant has a

18  severe mental impairment.  20 C.F.R. § 404.920a(d)(2).  "Fourth, when a mental

19  impairment is found to be severe, the ALJ must determine if it meets or equals a listing in

20  20 C.F.R. Part 404, Subpart P, Appendix 1."  Clayton, 2011 WL 997144, at *3 (citing 20

21  C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2)).

22         Finally, if a listing is not met, the ALJ then assesses the claimant's RFC, and the

23  ALJ's decision "must incorporate the pertinent findings and conclusions" regarding the

24  claimant's mental impairment, including a specific finding as to the degree of limitation as

25  to each of the functional areas described in sections 404.1520a(c)(3) and 416.920a(c)

26  (3).  Id. (citing 20 C.F.R. §§ 404.1520a(d)(3), (e)(2), 416.920a(d)(3), (e)(2)).  This is a

27  "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and]

28  requires a more detailed assessment by itemizing various functions contained in the

1  broad categories found in paragraphs B and C of the adult mental disorders listings in

2  12.00 of the Listing of Impairments . . . ."  Social Security Ruling ("SSR") 96-8p, 1996 WL

3  374184, at *4.

**THE ALJ'S FINDINGS**

5  On April 2, 2018, the ALJ issued his decision.  He determined that plaintiff was not

disabled, finding that he had the residual functional capacity to perform simple, unskilled

7  work, and that there were a significant number of jobs in the national economy that

8  plaintiff could perform.  AR 29–30.

9  **A.    The ALJ's Sequential Analysis**

10  At step one, the ALJ concluded that plaintiff had not engaged in substantial gainful

11  activity from May 14, 2015 to November 1, 2016.  Id. at 20.  Then, from November 1, 206

12  through July 2017, the ALJ found that plaintiff had engaged in substantial gainful activity

13  because the income plaintiff received while working at the U.S. Postal Service exceeded

14  the regulatory baseline amount for substantial gainful activity.  Id.  Considering these two

15  separate periods, the ALJ found there was a continuous 12-month period of no

16  substantial gainful activity from May 2015 to November 1, 2016, but no continuous 12-

17  month period after November 2016 through the date of decision.

18  At step two, the ALJ concluded that plaintiff has two medically determinable

19  impairments, schizophrenia and alcohol abuse.  Id.  The ALJ did not rate plaintiff's

20  hypertension as a severe impairment because the evidence did not demonstrate the

21  claimed hypertension was more than a slight abnormality that caused more than minimal

22  limitation on plaintiff's ability to perform basic work activities.  Id. at 21.

23  At step three, the ALJ concluded that plaintiff's impairments did not meet the

24  criteria for demonstrating the requisite severity of the impairments listed at title 20 C.F.R.

25  Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926) (the

26  "Listings").  Id. at 21–26.  The ALJ broadly determined the medical evidence of record to

27  be inconsistent with disability and weighed the medical evidence as follows.

28  In the period from May to October 2015, the ALJ rejected a May 2015 Sausal

United States District Court
Northern District of California

Creek GAF score of 30 because it was inconsistent with plaintiff's denial of audio and visual hallucinations.  Id. at 21.  The ALJ rejected a second May 2015 Sausal Creek GAF score of 49 because plaintiff's drug screen tested positive for THC, methamphetamine, and crack cocaine and the GAF score "appears to reflect the acute effects of claimant's intoxication more than any serious mental impairment."  Id.  The ALJ found three opinions to be persuasive: Dr. Gupta's September 2015 medical opinion, in which she assigned a GAF score of 60, consistent with mild to moderate impairment (id. at 21–22);  an emergency room mental examination by Dr. Lash where plaintiff denied hearing voices or having visual hallucinations; and Dr. Klein's opinion.  Id. at 22.

In the period from November 10, 2015 to February 8, 2016, the ALJ rejected a November 2015 GAF score of 45 by Shaun Orrante, MFT because Orrante was not an acceptable medical source and the score was inconsistent with Orrante's unremarkable contemporaneous observations.  Id. at 23.  The ALJ noted that, from November 2015 through plaintiff's February 8, 2016 discharge from BACS, plaintiff reported continuous improvement on Zyprexa.  To illustrate the improvement, the ALJ cited treatment notes that plaintiff was able to complete job applications, satisfy some probation requirements, and cope by being around friends.  Id.

In the period from February 8, 2016 to October 12, 2017, the ALJ noted three emergency room visits during which physicians conducted mental status examinations of plaintiff that were generally normal.  Id.  The ALJ rejected a GAF score of 45 by Shepard because she was not an acceptable medical source and the score was inconsistent with her unremarkable mental status examination.  Id.  The ALJ determined that plaintiff showed a general improvement on medication from a baseline of "less mood swings and no voices" that allowed plaintiff to return to substantial gainful activity in November 2016. Id. at 24.  In support of this conclusion, the ALJ cited plaintiff's return to substantial gainful employment in November 2016 and a March 2017 GAF score of 58.  Id.  The ALJ also cited Casa's treatment records showing that plaintiff enjoyed playing basketball and peer interaction.  Id.

The ALJ then analyzed whether plaintiff's mental impairments satisfied Listing 12.03. Id. at 25. When doing so, the ALJ noted that he considered "paragraph B" criteria, which mandates finding a qualifying mental impairment if a claimant's mental impairments causes either one "extreme" mental limitation or two "marked" limitations in any of the three following areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintain pace; and (4) adapting or managing oneself. Id. at 26. The ALJ determined that plaintiff did not satisfy paragraph B. The ALJ also found that plaintiff did not meet "paragraph C" criteria because claimant does not have a

> "serious and persistent" mental disorder over a period of two years with evidence of both: medical treatment, mental health therapy, psychosocial support(s), or a highly structured settling(s) that is ongoing and diminishes the symptoms and signs of your mental disorder; and marginal adjustment, that is minimal capacity to adapt to changes in the environment or to demands that are not already part of one's daily life.

Id.

Having found that plaintiff did not qualify as disabled under step three, the ALJ then determined plaintiff's residual functional capacity. To do so, the ALJ applied the following two-step process: Whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce plaintiff's pain or other symptoms; and once an underlying physical or mental impairment that could reasonably be expected to produce claimant's pain or other symptoms has been shown, the ALJ was required to evaluate the intensity, persistence, and limiting effects of the plaintiff's symptoms to determine the extent to which such effects limit plaintiff's functions. Id. at 26–27.

When applying these sub-steps, the ALJ summarized plaintiff's hearing testimony concerning his symptoms as follows. Plaintiff stopped working for the U.S. Postal Service because of his mental impairments and plaintiff "vaguely testified he cannot work because of his symptoms." Plaintiff stated that "in an average day, he watches television, goes out with friends, comes home, eats, takes his medications, and goes to sleep." Id.

13

at 27.  Plaintiff "vaguely testified he sometimes feels his treatment does not help to improve his symptoms."  Plaintiff denied using cocaine, methamphetamines, and marijuana and that he "slowed down drinking" to two to three cans of alcohol a day.  He also stated that he has "bad days" where he hears voices and is paranoid most days.  Id.

With respect to the first sub-step, the ALJ concluded that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  Id. at 28.  However, with respect to the second sub-step, the ALJ, concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  Id.  The ALJ determined that plaintiff was "limited to simple, unskilled work defined by regulation and ruling as work that needs little to no judgment to perform simple duties."  Id.

At step four, the ALJ determined that plaintiff is unable to perform relevant past work as a mail carrier.  Id. at 28–29.  At step five, based on the Medical-Vocational Guidelines, the ALJ determined that jobs exist in significant numbers in the national economy that plaintiff could perform given his age, education, work experience, and residual functional capacity.  Id. at 29–30.  Accordingly, the ALJ concluded that plaintiff has not been disabled from May 14, 2015 through the date of his decision.  Id. at 30.

**B.    The ALJ's Weighing of the Medical Opinions and Testimony**

The ALJ considered and weighed the testimony and opinions of several professionals.  Below, the court details such professionals, their respective opinions, and the weight assigned to each by the ALJ.

**1.    Consultative Examiner—Dr. Shephali Gupta, Psy.D.**

On September 1, 2015, Dr. Gupta performed a psychological evaluation on plaintiff.  In her report, Dr. Gupta catalogs plaintiff's chief complaints ("[a]nger problems, bad comprehension, schizophrenia and whatever comes with that"), her general observations, history concerning plaintiff's psychiatric, medical, psychological, educational, employment, substance and criminal backgrounds, as well as plaintiff's

United States District Court
Northern District of California

1   psychological test results.  Id. at 804–07.

2       With respect to plaintiff's test results, Dr. Gupta notes that she performed various

3   tests including a WAIS-IV exam, Wechsler Memory Scale exam ("WMS-IV"), and Trails A

4   and B exam.  Id. at 806–07.  Dr. Gupta recorded "average" to "low average" results with

5   respect to the various categories of plaintiff's WMS-IV test.  Id. at 806.  Dr. Gupta

6   recorded "average" to "low average" results with respect to plaintiff's WAIS-IV test,

7   including a full scale IQ composite score of 81, which was low average.  Id.  Dr. Gupta

8   recorded plaintiff's Trail A and B tests as "within normal rate."  Id.  Dr. Gupta conducted a

9   mental status examination noting that plaintiff's attention was "adequate."  Id. at 805.  Dr.

10  Gupta also noted that plaintiff's "memory was grossly intact," his insight and judgment

11  "appeared to be adequate," his mood was "average," his affect was "blunted," and his

12  thought process was "linear and logical."  Id.

13      At the end of her five-page report, she concludes the following concerning

14  plaintiff's functional capacity:

15      •   Plaintiff had no impairment with respect to his ability to follow simple
16          instructions or his ability to follow complex/detailed instructions.

17      •   Plaintiff's ability to maintain adequate pace or persistence to perform one or
18          two simple repetitive tasks had no impairment and complex tasks is "mild"

19      •   Plaintiff's ability to adapt to change in a job routine his ability to withstand
20          the stress of a routine workday was "mild."

21      •   Plaintiff's ability to appropriately interact with others on a regular basis was
22          "mild to moderate."

23      •   Plaintiff was unable to manage funds.  Id. at 808.

24  The ALJ correctly characterized each of the above determinations by Dr. Gupta.

25  Id. at 21–22.  The ALJ found Dr. Gupta persuasive because her opinion was consistent

26  with the medical evidence of record.  Id. at 22.

27      **2.    Initial Reviewer—Dr. Paul Klein, Psy.D.**

28  On October 20, 2015, a non-examining, non-treating state agency medical

1   consultant, Dr. Paul Klein, completed an initial review of the record and opined on

2   plaintiff's disability status under both Title II and Title XVI.  This review included a

3   summary of the then-existing medical opinions concerning plaintiff's residual functional

4   capacity, which at the time consisted only of Dr. Gupta's opinion.  Id. at 83.  At the end of

5   the initial review, Dr. Klein determined that plaintiff did not meet either the A or B criteria

6   of the listings.  Id. at 87.  The initial decision by Dr. Klein concluded that plaintiff did not

7   qualify as disabled for purpose of receiving social security benefits.  Id. at 89, 98.

8        The ALJ found Dr. Klein's opinion to be persuasive because it was consistent with

9   the medical evidence of record.  Id. at 22.

10           **3.**        **Reconsideration Reviewer—Dr. Norman Zukowsky, Ph.D.**

11        On May 26, 2016, another non-examining, non-treating state agency consultant,

12   Dr. Norman Zukowsky, issued an opinion reconsidering the initial decision by Dr. Klein

13   under both Title II and Title XVI.  Similar to Dr. Klein's initial review, Dr. Zukowsky's

14   reconsideration review included a summary of the relevant medical opinions and, similar

15   to the initial review, the only medical opinion cited was Dr. Gupta's.  Id. at 105.  Unlike Dr.

16   Klein, Dr. Zukowsky opined that plaintiff had limitations with respect to his mental residual

17   functional capacity including that plaintiff was "moderately limited" for such areas as "the

18   ability to maintain attention and concentration for extend periods" and "the ability to

19   perform activities within a schedule, maintain regular attendance, and be punctual within

20   customary tolerances."  Id. at 112–13.  Dr. Zukowsky recommended either "unskilled or

21   entry-level duties" as a result of plaintiff's limitations.  Id. at 114.  However, Dr. Zukowsky

22   concluded that given plaintiff's age, education, and RFC, plaintiff would still be able to

23   adjust to other work and that he was not disabled.  Id. at 115.

24        Similar to Dr. Klein, the ALJ found Dr. Zukowsky persuasive because his opinion

25   was consistent with the medical evidence of record.  Id. at 22.  The ALJ also was

26   persuaded by Dr. Zukowsky's opinion that plaintiff was capable of simple, unskilled work

27   with limited public contact.  Id.

28   / / /

United States District Court
Northern District of California

### 4.   Nurse Practitioner K. Lu Gilligan, N.P.

On October 1, 2016, Gilligan—who represented that she had been treating plaintiff since February 2016 on a bi-weekly or monthly basis—issued a letter regarding plaintiff's application for Social Security disability benefits.  Id. at 1117.  In it, she opined that plaintiff meets the Social Security criteria for schizophrenic disorders and stated that "[h]e continues to experience intrusive hallucinations of multiple voices that are taunting him, and delusions that there are ghosts continually watching him."  Id.  She also stated that "[a]s recently as 3 days ago, [plaintiff] was still experiencing paranoid delusions . . . [and] remains isolative and unable to function socially."  Id. at 1118.  Gilligan reports that "[e]ven in this supportive living environment[,] [plaintiff's] daily functioning is severely limited."  Id.

The ALJ gave "little weight" to Gilligan's opinion, noting first that Gilligan was not an acceptable medical source and that only the Commissioner can opine whether a claimant meets a disability listing.  Id. at 25.  The ALJ also discounted Gilligan's opinion because it was not consistent with the medical evidence of record.  Id.

### 5.   Therapist Teresa Shepard, LMFT

On December 5, 2017, Shepard issued a letter in support of plaintiff's Social Security application.  Id. at 1454–55.  Shepard begins by noting that she had been in an ongoing treatment relationship with plaintiff from February 2016 through the date of the letter and further stated that Gilligan's letter dated October 1, 2016 was "still an accurate account of Mr. Young's diagnosis, onset, and symptoms."  Id. at 1454.  Shepard goes on to opine that plaintiff "has poor insight.  He is not able to be self-reflective or self-aware and, as such, often does not accurately communicate about the extent or impact of his psychological impairments."  Id.  Shepard opined that plaintiff meets the A paragraph criteria for schizophrenia because, "[d]espite the overall positive impact that medication has had in managing [plaintiff's] symptoms, he has had and continues to have periods of increased symptoms, including intrusive auditory hallucinations."  Id.  She stated that plaintiff meets the paragraph B criteria because his negative symptoms interfere with his

1   activities of daily living; for example, she explained that "[h]e has poor memory and a very

2   diminished ability to follow through on tasks, in particular when the instruction of tasks

3   involves multiple steps." Id.  Finally, she opined that he meets paragraph C criteria

4   because he has been consistently in treatment and experiencing symptoms for over two

5   years.

6          The ALJ assigned "little weight" to Shepard's opinion because it was inconsistent

7   with the medical evidence of record and, similar to Gilligan, Shepard was not an

8   acceptable medical source. Id. at  25.  The ALJ stated that her opinion and Gilligan's

9   opinion were "inconsistent with their own treatment notes, which consistently show

10  unremarkable mental status examinations and indicate improvement on medication" from

11  plaintiff's baseline. Id.

12          **6.      Consultative Examiners—Dionne Childs, M.S. and Lesleigh Franklin,**

13                  **Ph.D.**

14          On November 11, 2017, Childs, under the supervisions of Franklin, conducted a

15  psychological evaluation of plaintiff.  In their report, Childs and Franklin cataloged the

16  procedures they administered to plaintiff to conduct the examination, his background, his

17  educational and work history, his substance abuse history, his medical and psychiatric

18  history, their observations of plaintiff's behavior and mental status, and their assessment

19  of his cognitive abilities. Id. at 1446–51.

20          In assessing plaintiff's cognitive abilities, Childs and Franklin tested plaintiff's

21  intellectual functioning using the Weschler Abbreviated Scale of Intelligence ("WASI"), his

22  neuropsychological functioning (i.e., language, visual abilities, memory and

23  concentration) using the Repeatable Battery for Assessment of Neuropsychological

24  Status ("RBANS"), as well as his emotional functioning using the Miller Forensic

25  Assessment of Symptoms Test ("M-FAST"). Id. at 1448.  Using the WASI, plaintiff

26  received a full-scale IQ score of 64. Id.  The RBANS test showed that plaintiff scored in

27  the "Extremely Low" range on the language, visuospatial/constructional, immediate

28  memory, delayed memory, and attention indices. Id. at 1449.  Childs and Franklin also

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1   assessed plaintiff as showing "impaired performance on measures of executive

2   functioning" using the Trails A and B exercises.  Id. at 1449–50.  However, plaintiff's

3   MMSE score was 29/30, which Childs and Franklin stated indicates that plaintiff was not

4   suffering from dementia or severe long term memory problems.  Id. at 1450.  Based on

5   the foregoing test results, they diagnosed plaintiff with schizophrenia, unspecified

6   depressive disorder, and borderline intellectual functioning.  Id.  They also found marked

7   or extreme limitations in all domains of work-related functioning.  Id. at 1452–53.

8        The ALJ found Childs and Franklin's assessment to be unpersuasive.  The ALJ

9   discounted the WASI test because it is not accepted by the SSA and the score was

10  "grossly inconsistent" with plaintiff's MMSE results as well as Dr. Gupta's 2015 WAIS

11  results, claimant's work history for the postal service, and observations of estimated

12  average intellectual functioning.  Id. at 25.  The ALJ rejected the RBANS results because

13  one month prior to the Childs and Franklin exam, Shepard noted that plaintiff "seemed to

14  have better than average understanding of news events than typical youth his age."  Id.

15  He also noted that the evaluation was conducted during a period of presumptive non-

16  disability.  Id.

17                                    **DISCUSSION**

18  **A.    Standard of Review**

19       This court has jurisdiction to review defendant's final decisions pursuant to 42

20  U.S.C. § 405(g).  The ALJ's decision must be affirmed if his findings are "supported by

21  substantial evidence and if the [ALJ] applied the correct legal standards."  Holohan v.

22  Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001).  Substantial evidence "means—and

23  means only—'such relevant evidence as a reasonable mind might accept as adequate to

24  support a conclusion.'"  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting

25  Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  If the evidence is subject

26  to more than one rational interpretation, the court must uphold the ALJ's findings if they

27  are "supported by inferences reasonably drawn from the record."  Tommasetti v. Astrue,

28  533 F.3d 1035, 1038 (9th Cir. 2008).  Yet the reviewing court "must consider the entire

United States District Court
Northern District of California

1  record as a whole, weighing both the evidence that supports and the evidence that

2  detracts from the Commissioner's conclusion, and may not affirm simply by isolating a

3  specific quantum of supporting evidence."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir.

4  2017).

5       "The ALJ in a social security case has an independent duty to fully and fairly

6  develop the record and to assure that the claimant's interests are considered."

7  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  An ALJ's paraphrasing of

8  record material must be accurate.  Reddick v. Chater, 157 F.3d 715, 722–23 (9th Cir.

9  1998).  Although the ALJ can and must weigh conflicting evidence, "he cannot reach a

10  conclusion first, and then attempt to justify it by ignoring competent evidence in the

11  record that suggests an opposite result."  Gallant v. Heckler, 753 F.2d 1450, 1456 (9th

12  Cir. 1984).

13       Additionally, in the Social Security context, the harmless error rule applies.  Curry

14  v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1991).  Harmless error is an error by the trier of

15  fact that is immaterial and therefore does not justify the reversal or modification of the

16  lower court's ruling.  Id. at 1131.

17  **B.    Analysis**

18       Plaintiff seeks an order reversing the ALJ's decision denying his application for

19  disability benefits and SSI.  In support of his request, plaintiff argues the ALJ erred in

20  seven discrete areas.  The court addresses each in turn.

21       **1.    Whether the ALJ Erred in Designating Certain Activity as Substantial**

22       **Gainful Activity**

23       The ALJ did not err in determining plaintiff performed substantial gainful activity

24  from November 2016 to July 2017.  Under the Social Security Act, disability is defined as

25  the inability "to engage in any substantial gainful activity by reason of any medically

26  determinable physical or mental impairment which . . . can be expected to last for a

27  continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

28  "Substantial gainful activity is work activity that is usually done for pay or profit and that

involves doing significant physical or mental activities, taking into account the nature of the work, how well it is performed, whether it is performed under special conditions, self-employment, and time spent working." Simpson v. Berryhill, No. 18-CV-00309-JSC, 2019 WL 2106591, at *2 (N.D. Cal. May 14, 2019) (citing 20 C.F.R. §§ 404.1572–73; 416.972–73).

In determining whether work activity constitutes substantial gainful activity, the SSA's "primary consideration will be earnings [the claimant] derive[s] from the work activity." 20 C.F.R. § 416.974(a)(1). "The mere existence of earnings over the statutory minimum is not dispositive." Keyes v. Sullivan, 894 F.2d 1053, 1056 (9th Cir. 1990) (citing Chicager v. Califano, 574 F.2d 161, 163 (3d Cir. 1978)). However, earnings over the statutory minimum creates a presumption of substantial gainful employment. Id. A claimant may rebut the presumption "based on earnings with evidence of his inability to be self-employed or to perform the job well, without special assistance, or for only brief periods of time." Id. (citing Anderson v. Heckler, 726 F.2d 455, 456 (8th Cir. 1984)).

Additionally, the Commissioner will "generally consider work that [the claimant is] forced to stop or to reduce below the substantial gainful activity level after a short time because of [his] impairment to be an unsuccessful work attempt. [The claimant's] earnings from an unsuccessful work attempt will not show that [he is] able to do substantial gainful activity." 20 C.F.R. § 416.974(a)(1). An unsuccessful work attempt occurs "if, after [the claimant] worked for a period of 6 months or less, [the claimant's] impairment forced [him] to stop working or to reduce the amount of work you do so that [his] earnings from such work fall below the substantial gainful activity level" set out in regulations and the claimant meets certain other requirements. 20 C.F.R. § 416.974(c)(1).

Here, plaintiff's earnings exceed the statutory minimum threshold, as further defined by 20 C.F.R. § 416.974(b)(2)(ii) and the SSA's monthly earnings amounts available online. Soc. Sec. Admin., Substantial Gainful Activity (2020), https://www.ssa.gov/oact/cola/sga.html. His monthly average for November and

United States District Court
Northern District of California

1    December 2016 was $3,048.00 and his earnings for the first and second quarters 2017

2    (i.e., January to June) were $3,979.00 and $6,595.00.[5]  AR 20.  Plaintiff's monthly

3    average for 2016 was $1,524.00, which was above the 2016 monthly average of

4    $1,130.00 for non-blind claimants.  Plaintiff's monthly average for 2017 was $1,762.33,

5    which was also above the 2017 monthly average of $1,170.00 for non-blind claimants.

6    Therefore, there is a presumption that plaintiff performed substantial gainful activity from

7    November 2016 to July 2017.  Plaintiff does not assert that any of the factors necessary

8    to rebut the presumption are present here.  See Corrao v. Shalala, 20 F.3d 943, 948 (9th

9    Cir. 1994) (citations omitted) (noting factors as "the responsibilities and skills required to

10   perform the work, the amount of time the individual spends working, the quality of the

11   individual's work, [and] special working conditions").

12          Rather, plaintiff attempts to characterize his employment at the Postal Service as

13   an unsuccessful work attempt because his medical record demonstrates that his anxiety

14   and symptoms of schizophrenia threatened his ability to maintain employment so much

15   that he required support from his vocational specialist to manage his schedule, identify a

16   sleep routine, and plan his transportation.  Dkt. 16 at 8.  An unsuccessful work attempt

17   requires that plaintiff's impairment forced him to stop working.  20 C.F.R. § 416.974(c)(1).

18   There is substantial evidence in the record demonstrating that the reason plaintiff

19   stopped working at the Postal Service was because his position was seasonal and

20   temporary in nature, i.e., not because of his impairment.  For example, on June 16, 2017,

21   Shepard reported that plaintiff stated that he had been laid off from his job.  AR 1386.  In

22   October 2017, Gilligan also noted that plaintiff's work was "as [a] temporary overnight

23   package handler."  Id. at 1431.  Moreover, the medical record that plaintiff cites is not

24   indicative that plaintiff's impairment prevented him from working.  On December 2, 2016,

25   Kim reported that plaintiff "recently gained employment and has expressed having

26

27   ───────────────────────

28   [5] It also appears that plaintiff earned an additional $8,333.00 in the second quarter 2017
     from the U.S. Postal Service that the ALJ did not add to his calculations.  See AR 327.
     Including this additional amount only buttresses the ALJ's conclusion.

1  positive experiences thus far." Id. at 1344.  On December 6, 2016, one of plaintiff's group

2  therapists reported that he "continues to do well in his new job" and the plaintiff

3  "expressed some concern around job scheduling and his ability to 'keep up with the

4  schedule.'" Id. at 1343.  Thus, there is substantial evidence that plaintiff's work attempts

5  ended not because of his impairment but because the position itself was temporary in

6  nature.

7       Finally, plaintiff suggests the ALJ erred by also finding plaintiff's work in October

8  2017 as a temporary garbage collector to be substantial gainful activity.  The ALJ stated

9  that a treatment note from Gilligan indicated that plaintiff worked three days a week for

10  $100.00 a day suggesting a monthly income of $1,200.00. Id. at 20.  The ALJ did not

11  discuss testimony he received from plaintiff indicating that the actual amount received

12  was around $76.00 a day, which would suggest his monthly income to be $912.00.  The

13  2017 monthly amount was $1,170.00, which would make the ALJ's discrepancy

14  meaningful.  Nonetheless, any error here is harmless because there was no continuous

15  12-month period from July 2017 to the ALJ's decision in April 2018 that plaintiff did not

16  engage in substantial gainful activity.

17       **2.       Whether the ALJ Erred in Identifying a Severe Impairment**

18       At step two, the ALJ listed two severe impairments: schizophrenia and alcohol

19  abuse.  AR 20.  Plaintiff contends this was in error because the ALJ should have also

20  found that plaintiff's borderline intellectual functioning as a severe impairment.  Dkt. 16 at

21  9–10.  Defendant argues that any failure to list borderline intellectual functioning is

22  harmless because the ALJ considered and rejected medical opinions containing plaintiff's

23  borderline intellectual functioning diagnosis at step four.  Dkt. 17 at 4–5.

24       Generally, step two requires the ALJ to determine whether the claimant has an

25  impairment or combination of impairments that "significantly limits" the claimant's ability to

26  do "basic work activities."  20 C.F.R. § 416.920(c).  "[T]he ALJ must consider the

27  combined effect of all of the claimant's impairments on [his] ability to function, without

28  regard to whether each alone was sufficiently severe."  Smolen v. Chater, 80 F.3d 1273,

United States District Court
Northern District of California

1290 (9th Cir. 1996) (citing 42 U.S.C. § 423(d)(2)(B); and SSR 86-8, 1986 WL 68636; and SSR 85–28, 1985 WL 56856).  Step two is a "de minimis screening device to dispose of groundless claims."  Id. (citing Bowen v. Yuckert, 482 U.S. 137, 152–52 (1987)).  "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability to work.'"  Id. (citing SSR 85–28; and Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988)).

"Where the ALJ finds at least one severe impairment at step two, and properly considers all medically determinable impairments at step four, failing to find that any specific impairment is severe is harmless error."  Bass v. Berryhill, No. 18-CV-07053-DMR, 2020 WL 1531324, at *3 (N.D. Cal. Mar. 31, 2020) (citing Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017); and Brown v. Berryhill, No. 16-cv-04022-EMC, 2017 WL 4417516, at *7 (N.D. Cal. Oct. 4, 2017)).  "However, if an ALJ does not consider all medically determinable impairments when assessing a claimant's RFC, then an error at step two is not harmless."  Id. (citing Mercado v. Berryhill, No. 16-cv-04200-BLF, 2017 WL 4029222, at *6 (N.D. Cal. Sept. 13, 2017)).

Here, the ALJ found at least one severe impairment at step two therefore any error by failing to list borderline intellectual functioning is harmless as long as he discussed all medically determinable impairments when assessing plaintiff's RFC.  Yet, the ALJ failed to consider plaintiff's borderline intellectual functioning when assessing his RFC.  The ALJ's RFC assessment does not clearly specify which impairments informed the assessment.  For example, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" and then found that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms to be inconsistent with the medical evidence.  AR 28.  It appears that he meant plaintiff's schizophrenia and psychosis as the ALJ references plaintiff's psychosis in the RFC assessment.  See id. at 27–28 ("Their statements of active psychosis are inconsistent with Nurse Gilligan's nearly contemporaneous assessment of

United States District Court
Northern District of California

United States District Court
Northern District of California

1  psychosis in remission.").  At the very least, he did not discuss any intellectual functioning

2  in his assessing plaintiff's RFC.  Because the ALJ did not discuss plaintiff's borderline

3  intellectual functioning when assessing plaintiff's RFC, the court must evaluate the ALJ's

4  step two analysis for error.  See Bass, 2020 WL 1531324, at *3; Mercado, 2017 WL

5  4029222, at *6.

6         There is sufficient evidence in the record to support plaintiff's borderline intellectual

7  functioning as a medically determinable impairment.  A claimant must establish a

8  physical or mental impairment with medical evidence consisting of signs, symptoms, and

9  laboratory findings and not by symptoms alone.  20 C.F.R. § 416.908.  To be a severe

10  impairment, the impairment must last or be expected to last for a continuous period of at

11  least 12 months.  20 C.F.R. § 414.909.  The evidence supporting plaintiff's impairment

12  includes IQ tests administered at various points in time.  "Under the DSM-IV, borderline

13  intellectual functioning was defined by an IQ of 71 to 84."[6]  Merriott v. Berryhill, No. CV-

14  17-00138-TUC-LCK, 2018 WL 3610969, at *3 (D. Ariz. July 27, 2018) (citing Am. Psych.

15  Ass'n, Diagnostic & Statistical Manual of Mental Disorders 48 (4th ed. 2000)); see also

16  Gomez v. Astrue, 695 F. Supp. 2d 1049, 1053 n.2 (C.D. Cal. 2010) ("[A]n IQ of 70–85

17  signifies borderline intellectual functioning.") (citing Stedman's Medical Dictionary

18  "retardation" (27th ed. 2000))).

19         Both Dr. Hardey in 2011 and Dr. Gupta in 2015 measured plaintiff's full scale IQ as

20  within the borderline range of intellectual functioning—71 and 81, respectively.  AR 757–

21  58, 806.  Childs assessed plaintiff's full scale IQ as 64 and Franklin diagnosed plaintiff as

22  having borderline intellectual functioning.  Id. at 1448, 1451.  The SSA found that, as a

23  child, plaintiff had borderline intellectual functioning at a level sufficient to qualify for

24  disability payments.  Id. at 81, 285, 749.  Plaintiff was enrolled in special education

25  classes in school to help him overcome his borderline intellectual functioning.  Id. at 661–

26  748 (plaintiff's high school education records).

27

28  [6] The fifth edition of the DSM eliminated all references to IQ, including in reference to
borderline intellectual functioning.

1   There is also sufficient evidence that plaintiff meets the durational requirement.

2 Plaintiff's borderline intellectual functioning was first diagnosed when he was five (AR

3 635) and then reconfirmed by Dr. Hardey in 2011 and Dr. Gupta in 2015.  Franklin also

4 diagnosed plaintiff with borderline intellectual functioning in 2017, though the ALJ

5 correctly points out that the test used by Childs and Franklin is not permitted to diagnose

6 a disability.  See infra section B.3.vi.

7   Despite this evidence in the record, defendant contends any error is harmless

8 because the ALJ cited reasons to discount Dr. Hardey's and Franklin's opinions.  Dkt. 17

9 at 5.  The ALJ assigned little weight to Dr. Hardey's opinion because it fell too far outside

10 the relevant time period and related to an administratively final determination.  AR 24.

11 While defendant is correct that the ALJ may reject medical opinions that were more

12 remote in time (Johnson v. Astrue, 303 Fed. App'x 543, 545 (9th Cir. 2008) (unpublished

13 opinion)), the ALJ did not cite any medical opinion that contradicts Dr. Hardey's

14 assessment.[7]  Therefore, the ALJ can only reject Dr. Hardey's opinion with clear and

15 convincing reasons supported by substantial evidence.  Popa v. Berryhill, 872 F.3d 901,

16 906 (9th Cir. 2017) (citing Lester v. Chater, 81 F.3d 821, 830–31 (9th Cir. 1995)).  The

17 ALJ did not do so.  While Dr. Hardey's assessment relates to an administratively final

18 decision, an ALJ "will accept the factual finding made in the previous determination or

19 decision unless there are reasons to believe that [the finding] was wrong."  20 C.F.R.

20 § 416.1450(f).  The ALJ did not cite a reason to believe Dr. Hardey's finding was wrong.

21   The ALJ rejected Franklin's borderline intellectual functioning diagnosis and her

22 medical opinion because they were based on questionable results and were inconsistent

23 with the evidence of record.  AR 25.  As discussed herein, the ALJ's rejection of

24 Franklin's medical opinion regarding the borderline intellectual functioning disorder was

25 error.

26

27 ———————————

[7] The court notes that Dr. Gupta's WAIS-IV result (full scale IQ of 81 with a "Low
28 Average" level of ability), AR 806, is not clearly inconsistent with the other IQ
assessments.

United States District Court
Northern District of California

In sum, the ALJ erred by failing to consider whether plaintiff's borderline intellectual functioning was a severe impairment at step two.  This is not to suggest the ALJ was required to find plaintiff's borderline intellectual functioning as per se severe; rather, the ALJ erred by failing to address the impairment at step two and then failing to account for the limitations at step four.  The court also notes that the ALJ did not consider whether plaintiff's schizophrenia combined with his borderline intellectual functioning significantly limited plaintiff's ability to do basic work activities.  20 C.F.R. § 416.945(a)(2).  The court draws particular attention to this issue because, as stated by a different court in this district, borderline intellectual functioning may affect plaintiff's ability to recognize and articulate his own symptoms.  See Reed v. Berryhill, No. 16-CV-06710-MEJ, 2017 WL 4948593, at *9 (N.D. Cal. Nov. 1, 2017) ("The ALJ also does not analyze whether Plaintiff's borderline level of intelligence might affect his ability to recognize psychological symptoms and articulate them, much less obtain treatment for those problems.").

### 3.    Whether the ALJ Erred When Evaluating Medical Opinions

For claims filed before March 27, 2017, an ALJ applies the rules in title 20 C.F.R. § 416.927 to evaluate medical opinion evidence.  20 C.F.R. § 416.927.  An ALJ must consider all medical opinions in the record together with any other relevant evidence received.  20 C.F.R. § 416.927(b).

The Ninth Circuit and applicable regulations distinguish between three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining, non-treating physicians).  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. § 416.927(c).  Unless an ALJ assigns a treating source's medical opinion "controlling weight" under 20 C.F.R. § 416.927(c)(2), the ALJ generally considers the following factors when assigning weight to any particular medical opinion:

- Examining relationship: An ALJ gives more weight to the medical opinion of a source who has examined the claimant as opposed to one who has not.

United States District Court
Northern District of California

20 C.F.R. § 416.927(c)(1).

- Treatment relationship: An ALJ gives more weight to medical opinions from a claimant's treating source. 20 C.F.R. § 416.927(c)(2).
- Supportability: The more a medical source presents relevant evidence to support a medical opinion or better explains its conclusions, the more weight the ALJ will give that medical opinion.  With respect to non-examining source opinions, the weight given will depend on the degree to which they provide supporting explanations for their opinions, including whether they consider all of the pertinent evidence to a claim such as medical opinions of treating and other examining sources.  20 C.F.R. § 416.927(c)(3).
- Consistency: The more consistent a medical opinion is with the overall record, the more weight the ALJ will give that opinion.  20 C.F.R. § 416.927(c)(4).
- Specialization: An ALJ will give relatively more weight to the medical opinion of a specialist about medical issues related to his area of specialty. 20 C.F.R. § 416.927(c)(5).
- Other factors: An ALJ may also consider other factors brought to his attention that tend to support or contradict an opinion.  20 C.F.R. § 416.927(c)(6).

Under 20 C.F.R. § 416.927(c)(2), if an ALJ finds that a treating source's medical opinion on an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, then the ALJ will give it "controlling weight."  20 C.F.R. § 416.927(c)(2).  Otherwise, to determine the weight of such opinion, the ALJ must apply the factors listed in § 416.927(c)(2)(i)–(ii) and 416.927(c)(3)–(6).  20 C.F.R. § 416.927(c)(2).  In any event, the ALJ must provide "good reasons" for the weight given to a treating source's opinion.  20 C.F.R. § 416.927(c)(2) ("We will always give good

1   reasons in our notice of determination or decision for the weight we give your treating

2   source's medical opinion.").

3       The Ninth Circuit acknowledges that that an ALJ may reject an uncontradicted

4   opinion of a claimant's treating physician only for "clear and convincing" reasons

5   supported by substantial evidence.  Popa, 872 F.3d at 906.  In the event an ALJ rejects a

6   treating or examining physician's opinion that is contradicted by another doctor, the ALJ

7   must set forth "specific and legitimate reasons that are supported by substantial

8   evidence."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Ryan v.

9   Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008)).

10      In addition to the three sorts of physician-related acceptable medical sources

11  discussed immediately above, an ALJ may also consider medical opinions from "not

12  acceptable" medical sources, i.e., nonmedical sources.  20 C.F.R. § 416.927(f).  When

13  doing so, an ALJ generally applies the same considerations described at

14  § 416.927(c)(1)–(6), although the ALJ need not consider all such factors.  20 C.F.R.

15  § 416.927(f).  "Depending on the particular facts in a case, and after applying the factors

16  for weighing opinion evidence, an opinion from a medical source who is not an

17  acceptable medical source or from a nonmedical source may outweigh the medical

18  opinion of an acceptable medical source, including the medical opinion of a treating

19  source."  20 C.F.R. § 416.927(f).  Such a finding may be warranted in circumstances

20  where a not acceptable medical source "has seen the individual more often than the

21  treating source, has provided better supporting evidence and a better explanation for the

22  opinion, and the opinion is more consistent with the evidence as a whole."  Id.  Relatedly,

23  the Ninth Circuit has stated that "[a]n ALJ may discount the opinion of an 'other source,'

24  such as a nurse practitioner, if she provides 'reasons germane to each witness for doing

25  so.'"  Popa, 872 F.3d at 906.

26          i.      **Whether the ALJ Erred When Weighing Drs. Phillips and**

27                  **Boutelle's Opinions**

28      Plaintiff argues that the ALJ erred by failing to mention or credit the opinions of

29

United States District Court
Northern District of California

Drs. Phillips and Boutelle who treated plaintiff at BACS and diagnosed plaintiff with schizophrenia.  Dkt. 16 at 12.  Defendant responds that these are not medical opinions but rather treatment notes that need not be credited.  Dkt. 17 at 6.

Medical opinions reflect "judgments about the nature and severity of . . . impairment(s), including . . . symptoms, diagnosis, prognosis, what [a claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 404.927(a)(1).  The court agrees with defendant that Drs. Phillips and Boutelle's records do not meet the definition of a medical opinion.  Rather, they "simply record[] [the physicians'] observations of [plaintiff's] appearance and behavior.  Bass, 2020 WL 1531324, at *6.  Therefore, they are treatment notes.

Because Drs. Phillips and Boutelle's reports were treatment notes, the ALJ was not required to specifically address their reports, especially where the reports were not probative of plaintiff's RFC.  Thus, the ALJ did not err by failing to specifically address Drs. Phillips and Boutelle's treatment notes.

### ii.   Whether the ALJ Erred When Weighing Dr. Elder and Shepard's Opinion

With respect to Shepard and Dr. Elder's statement, plaintiff argues that the ALJ was required to provide specific and legitimate reasons to reject the opinions of Dr. Elder.  Dkt. 16 at 12.  Defendant responds that Dr. Elder and Shepard filled out intake paperwork and, because they only recorded plaintiff's responses to his intake interview, the ALJ did not need to accord any particular weight to their opinion.  Dkt. 17 at 7.  The ALJ did not evaluate Shepard and Dr. Elder's statement as a medical opinion.

There are two notable entries from Shepard and Dr. Elder.  The first, dated July 23, 2016, is a mental health assessment that Shepard completed and Dr. Elder co-signed as part of plaintiff's intake into Casa.  AR 1132.  As defendant indicates, there are several entries in the assessment that only record plaintiff's subjective complaints and statements.  Id. at 1121–25, 28–29.  However, Shepard also recorded her perceptions of plaintiff in a check-the-box format.  For example, she assessed plaintiff as having

30

"unremarkable" "appearance/grooming," "speech," "orientation," "memory," and "intellect." Id. at 1130.  Shepard assessed plaintiff as having a "depressed" mood/affect and a remarkable fund of knowledge that was "limited in scope or ability to speak about."  Id. Shepard also found his insight/judgment to be remarkable for "potentially impaired or history of impairment."  Id.  She rated plaintiff as having severe impairments related to his activities of daily living and episodes of decompensation.  Id. at 1131.

The second entry, dated October 31, 2016, described plaintiff's discharge summary from Casa and it appears that Shepard completed the entry with Dr. Elder's co-signature.  Id. at 1119–20.  That summary noted that plaintiff adhered to medications and "stabilized his mental health."  Id. at 1119.  They also reported that plaintiff "often engaged in pro-social activities, playing basketball and walking in the community with his peers."  Id.  Shepard and Dr. Elder reported plaintiff's Axis I diagnosis as schizophrenia and noted that his GAF score, as of June 2016, was 45.  Id. at 1120.

These two entries do not meet the characteristics of medical opinions; rather, they are consonant with treatment notes.  There are no opinions about the nature and severity of what plaintiff could do or plaintiff's mental restrictions.  Similar to the notes by Drs. Boutelle and Phillips, the ALJ did nor err by failing to specifically address the treatment notes signed by Dr. Elder.

### iii.    Whether the ALJ Erred When Weighing Plaintiff's Medical Evidence of Record from His Treating Providers

Plaintiff contends that the ALJ erred by failing to discuss opinions and GAF scores from plaintiff's providers at BACS, Casa, PREP, and Sausal Creek and did not provide germane reasons for rejecting those records and opinions.  Dkt. 16 at 12–13.  Defendant does not specifically address any particular provider but rather argues that the ALJ referenced the treatment notes from providers at BACS, Casa, PREP, and Sausal Creek by citing the exhibit numbers containing those treatment notes.  Dkt. 17 at 7.

The ALJ did not err in his assessing records from plaintiff's providers at BACS, Casa, PREP, and Sausal Creek.  First, as defendant points out, these records are not

opinion, only treatment notes.  Second, the ALJ cited and discussed some examples from the medical record.  See AR 22–24.  Third, the ALJ did not err by rejecting various GAF scores assessed by various non-physician providers.  See Hughes v. Colvin, 599 Fed. App'x 765, 766 (9th Cir. 2015) (unpublished opinion) ("The ALJ did not err in failing to address Dr. Caverly's GAF score, because a GAF score is merely a rough estimate of an individual's psychological, social, or occupational functioning used to reflect an individual's need for treatment, but it does not have any direct correlative work-related or functional limitations." (citing Vargas v. Lambert, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998))).

>    **iv.**    **Whether the ALJ Erred When Weighing Nurse Gilligan's Opinion**

The ALJ erred when discounting Gilligan's opinion.[8]  Gilligan, "as a nurse practitioner, qualified as an 'other source[]' that can provide evidence about the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work.'"  Garrison, 759 F.3d at 1013–14 (alterations in original) (quoting 20 C.F.R. § 404.1513(d)).  Gilligan proffered her opinion on October 1, 2016 and she stated that she had a treating relationship with plaintiff since February 2016.  AR 1117.  The medical opinions concerning plaintiff's mental status and adverse to his position are based on one examining but non-treating and two non-examining, non-treating evaluations that occurred before October 2016 (Drs. Gupta, Klein, and Zukowsky).  The ALJ fails to provide any germane reason or evidence showing that such evaluations accurately reflected plaintiff's physical status as of October 2016.  Id. at 25.  Such failure is

---

[8] As a general matter, the court notes that the ALJ's selection of evidence from the record tended to only support his conclusions rather than assess evidence that both supports and detracts from plaintiff's claim.  For example, the ALJ cites Shepard's treatment notes as a reason to discount Franklin's opinion (AR 25), while also finding Shepard's medical source statement to be inconsistent with the medical evidence of record (id.).  Yet, there is no corresponding discussion of Shepard's observations and notes that tend to support plaintiff's claim.  The ALJ tended to credit Shepard's and Gilligan's treatment notes when they supported his conclusion and discounted their opinions when they were contrary to his conclusion.  This suggests that the ALJ reached a conclusion first and then attempted to justify it by ignoring competent evidence from the record.  See Gallant, 753 F.3d at 1456.  While not necessarily an independent reason to reverse the ALJ, it is a relevant consideration when reviewing Gilligan's, Shepard's, and Childs and Franklin's opinions.

United States District Court
Northern District of California

1   particularly notable given that certain records made by Gilligan detail the sorts of

2   psychological limitations that support plaintiff's claim.  E.g., id. at 1362 (describing

3   September 2016 incident).

4         In rejecting her opinion, the ALJ cited inconsistencies between Gilligan's opinion,

5   on the one hand, and her treatment notes and the medical evidence of record on the

6   other.  Id. at 25.  The ALJ does not cite the particular medical evidence of record

7   supporting his conclusion; instead, he states that the notes "consistently show

8   unremarkable mental status examinations and indicate improvement on medication."  Id.

9   Gilligan's treatment notes are not as consistently unremarkable as the ALJ indicates.  For

10  example, on September 12, 2016, both Kim and Gilligan reported that plaintiff underwent

11  a psychotic episode.  Kim stated plaintiff "was internally preoccupied and endorsed

12  hearing multiple voices throughout session."  AR 1363.  Plaintiff reported that "his voices

13  were at a '7' out of 10 in severity and that he would like to go to the hospital if they reach

14  a '10.'"  Id.  Gilligan also noted plaintiff "reported an increase in hallucinosis and paranoia,

15  stating that multiple voices were intrusive and that he had grown fearful over the past

16  week."  Id. at 1362.  Gilligan increased plaintiff's Zyprexa dosage and started him on

17  Risperdal.  Id.

18         Significantly, the ALJ failed to consider Gilligan's opinion using the factors listed in

19  § 416.927(c)(1)–(6).  See § 416.927(f) ("Although we will consider these opinions using

20  the same factors as listed in paragraph (c)(1) through (c)(6) in this section, not every

21  factor for weighing opinion evidence will apply in every case because the evaluation of an

22  opinion from a medical source who is not an acceptable medical source or from a

23  nonmedical source depends on the particular facts in each case."); see also Garrison,

24  759 F.3d at 1013–14 (noting that ALJ committed error by failing to recognize that nurse

25  practitioner "qualified as an 'other source[]' that can provide evidence about the severity

26  of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work"

27  (alterations in original) (quoting 20 C.F.R. § 1513(d))).  The ALJ failed to address the

28  regularity with which Gilligan met with plaintiff, which is an important factor for assigning

United States District Court
Northern District of California

weight to her opinion under § 416.927(f) ("[I]t may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source.").  The administrative record reflects that Gilligan met with plaintiff on a bi-weekly or monthly basis from February 2016 to at least October 2017.  While Gilligan is not an acceptable medical source, the ALJ brushed past the fact that Gilligan had a longitudinal treating relationship with plaintiff; none of the medical opinions upon which the ALJ relied (Drs. Gupta, Klein, and Zukowsky) had a similar breadth of data or had any treating relationship with plaintiff.

Given the above, the ALJ erred by failing to provide a germane reason when assigning Gilligan's opinion "little weight."  That error was not harmless because Gilligan opined about various limitations relevant to the ALJ's assessment of plaintiff's RFC.

### v.  Whether the ALJ Erred When Weighing Shepard's Opinion

The ALJ erred by assigning Shepard's opinion "little weight."  AR 25.  Like Gilligan, he dismissed Shepard's opinions because she was not an acceptable medical source and because her opinion conflicted with her treatment notes.  Id.  Shepard's opinion, dated December 5, 2017, served as a supplement to Gilligan's October 2016 opinion.  Id. at 1454.  Shepard represented that she had a treating relationship with plaintiff since February 2016 through December 2017.  Id.

Similar to Gilligan's opinion, the ALJ failed to consider Shepard's opinion using the factors listed in § 416.927(c)(1)–(6).  See § 416.927(f); see also Garrison, 759 F.3d at 1013–14.  Also similar to Gilligan, Shepard had a treating relationship with plaintiff that was significant in both duration and frequency.  Despite the lengthy treating relationship, the ALJ discounted Shepard's opinion by citing inconsistent treatment notes.  Yet, the ALJ did not cite specific inconsistencies nor did he cite or discuss Shepard's treatment notes that support rather than detract from Shepard's opinion.

Thus, the ALJ erred by assigning Shepard's opinion little weight without providing germane reasons for doing so.  This error was not harmless because she opined about how plaintiff's symptoms effected his daily activities and ability to maintain employment.

United States District Court
Northern District of California

United States District Court
Northern District of California

### vi.      Whether the ALJ Erred When Weighing Franklin and Childs' Opinion

The ALJ erred when he found the observations of Childs and the opinion of Franklin unpersuasive.  The ALJ focused largely on Franklin's borderline intellectual functioning diagnosis and noted that he was unpersuaded by the full scale IQ of 64 result from the WASI test.  AR 25.  He cited six reasons in support of that conclusion: the WASI test is not accepted by the SSA, the test was inconsistent with Dr. Gupta's WAIS results, plaintiff's work history for the U.S. Postal Service, observations of estimated average intellectual functioning, and the ALJ found the score to be grossly inconsistent with plaintiff's MMSE score administered by Childs.  Id.

A disputed medical source opinion can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  Revels, 874 F.3d at 654.  The ALJ is required to weigh evidence according to several factors, including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability; consistency; and specialization.  20 CFR § 416.927.  Each of the six reasons cited by the ALJ are neither specific and legitimate nor supported by substantial evidence in the record.

First, according to the SSA's Program Operations Manual Systems, the Wechsler Abbreviated Scale of Intelligence is essentially a screening test that is used to "estimate IQ based on some, but not all, of the subtests contained in the Wechsler series of intelligence tests."  Program Operations Manual Systems, DI 24583.055, Using Intelligence Tests to Evaluate Cognitive Disorders, Including Intellectual Disorder, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424583055.  The Manual instructs: "[d]o not use the results of abbreviated tests to determine whether the person has a mental impairment that meets or medically equals the requirements of listings 12.05 or 112.05.  Abbreviated or screening tests may be used to rule out a medically determinable impairment but cannot be used to establish a medically determinable impairment."  Id.  The WASI result cannot establish disability, but it is relevant evidence that the ALJ can

United States District Court
Northern District of California

1  consider in combination with other objective tests conducted by Childs and previous IQ

2  results from Drs. Hardey and Gupta demonstrating IQ results in the borderline intellectual

3  functioning range.

4  Second, Dr. Gupta's full scale IQ result of 81 was a "low average" result, which is

5  not clearly inconsistent with the full scale IQ result assessed by Childs.  Third, as Franklin

6  described in his opinion, the MMSE is cognitive test and is "a simple measure utilized to

7  describe an individual's current mental status, and is less comprehensive than the other

8  tests performed. . . . The MMSE does help us to screen for patients with more severe

9  neuropsychological illnesses as a result of brain disease or physical trauma . . . ."  AR

10  1448.  The ALJ did not cite any reason why a cognitive impairment test (MMSE)

11  contradicts an IQ test (WASI).  Instead, these assessments test different attributes

12  (cognition vs. intelligence).  See McGarrah v. Berryhill, No. 17-cv-03092-DMR, 2018 WL

13  4207300, at *12 (N.D. Cal. Sept. 9, 2018) ("Based on this description of the test, it makes

14  little sense to point to [the claimant's] overall MMSE score of 29/30 and conclude that it

15  'indicated no impairment,' because [the claimant] does not allege 'more serious

16  neuropsychological illnesses as a result of brain disease of physical trauma.'").  Focusing

17  on the MMSE score also ignores the other objective tests conducted by Childs.

18  Fourth, the ALJ cited plaintiff's employment and observations of estimated

19  average intellectual functioning, yet those references lack any specific citation to the

20  medical evidence of record.  As an initial matter, the Ninth Circuit has not held that an

21  ALJ may discount objective test scores using observations from the record.  Some district

22  courts in this circuit, citing Eighth Circuit precedent, have found that "[i]n assessing the

23  validity of IQ scores, the ALJ 'may disregard test scores that are inconsistent with an

24  applicant's demonstrated activities and abilities as reflected in the record as a whole.'"

25  See, e.g., Cometa v. Berryhill, No. 17-CV-06224-EDL, 2019 WL 1473454, at *15 (N.D.

26  Cal. Feb. 14, 2019) (quoting Clay v. Barnhart, 417 F.3d 922, 929 (8th Cir. 2005)); Wedge

27  v. Astrue, 624 F. Supp. 2d 1127, 1131 (C.D. Cal. 2008) ("Although the Ninth Circuit has

28  not yet decided what factors the ALJ may use in determining the validity of a test result,

36

other Circuits have allowed the ALJ to use several factors in assessing the validity of test results." (citing Clay, 417 F.3d at 929)).  Yet, even assuming an ALJ can use observations from the record to disregard an objective assessment, the ALJ did not cite specific instances in the record to discount such a test.  Instead, in a parenthetical, he cited two references to the record to demonstrate "estimated average intellectual functioning."  Neither reference in the parenthetical support his point: the first reference is to plaintiff's initial PREP intake assessment by Shinn, which does not explicitly discuss average intellectual functioning. AR 1369–73.  The second reference is to Franklin's opinion.  Id. at 1446–52.  In sum, the reasons cited by the ALJ to reject Franklin's borderline intellectual functioning diagnosis are not specific and legitimate reasons supported with substantial evidence from the record.

Finally, the ALJ did not comment on Franklin's opinion to the extent it addressed plaintiff's limitations beyond the borderline intellectual functioning diagnosis.  Franklin's opinion was based on a clinical interview with plaintiff, a review of his medical records, and a series of objective tests.  With that information, Franklin opined that plaintiff has "difficulty remembering and following instructions, low frustration tolerance, and trouble consistently complying with strict workplace expectations.  He has a general history of poor social interactions.  Mr. Young also has a pattern of perceptual distortions and poor coping skills, which appear to have influenced the severity of his mental health concerns."  Id. at 1450–51.  The ALJ failed to address these aspects of Franklin's opinion.

Thus, the ALJ erred by failing to provide specific and legitimate reasons supported by substantial evidence to discount the Franklin and Childs opinion.  The error was not harmless because Franklin and Childs opined that plaintiff had limitations that would have informed the ALJ's RFC assessment.  See id.

### 4.    Whether the ALJ Erred in Assessing Plaintiff's Statements

Plaintiff contends that the ALJ erred by rejecting his testimony without clear and convincing reasons supported by substantial evidence.  Dkt. 16 at 20.  Defendant responds that the ALJ made sufficiently specific findings supported by substantial

evidence.  Dkt. 17 at 12–13.  For example, the ALJ cited evidence that plaintiff received effective treatment when he reported that his symptoms were "well managed by medication" and determined that plaintiff engaged in activities inconsistent with disability. Id. at 13.

When the medical records show that "[a claimant has] a medically determinable impairment(s) that could reasonably be expected to produce [his] symptoms, such as pain," an ALJ  "must then evaluate the intensity and persistence of [the claimant's] symptoms so that [the Commissioner] can determine how [his] symptoms limit [his] capacity for work."  20 C.F.R. § 416.929(c)(1).  To evaluate such symptoms, the ALJ "consider[s] all of the available evidence from [the claimant's] medical sources and nonmedical sources about how [his] symptoms affect [him]."  Id.  Such evidence includes medical opinions, 20 C.F.R. § 416.929(c)(1), findings "obtained from the application of medically acceptable . . . techniques," 20 C.F.R. § 416.929(c)(2), and "any other information [a claimant] may submit about [his] symptoms," 20 C.F.R. § 416.929(c)(3).

When making that consideration, an ALJ will look to a claimant's "statements in relation to the objective medical evidence and other evidence" and "whether there are any inconsistences in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence."  20 C.F.R. § 416.929(c)(4).  An ALJ will find that a claimant's symptoms diminish his or her "capacity for basic work activities . . . to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence."  Id.  Social Security Ruling 16-3p further provides that, when evaluating an individual's testimony concerning his symptoms, an ALJ may not simply "make a single, conclusory statement" discounting such testimony or only "recite" the factors described in the regulations for evaluating symptoms.  SSR 16-3P, 2016 WL 1119029, at *9.  Rather, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer

can assess how the adjudicator evaluated the individual's symptoms."  Id.

In the Ninth Circuit, in the absence of evidence of malingering by a claimant, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so."  Lengenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting Smolen, 80 F.3d at 1281; and citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006)).[9]  "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'"  Garrison, 759 F.3d at 1015 (quoting Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)).  "The Ninth Circuit has held that an ALJ does not meet this standard 'by simply reciting the medical evidence in support of his or her residual functional capacity determination.'"  Ruben A. v. Saul, No. 19-CV-03893-EMC, 2020 WL 1897578, at *7 (N.D. Cal. Apr. 16, 2020) (quoting Brown-Hunter v. Colvin, 806 F.3d 487, 489 (9th Cir. 2015)).  Rather, the ALJ must "specify which testimony [he] finds not credible, then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination."  Brown-Hunter, 806 F.3d at 489.

Here, as an initial matter, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  AR 28.  The ALJ did not find any evidence of malingering.  As a result, the ALJ was required to evaluate plaintiff's allegations concerning his symptoms.  At the hearing, plaintiff testified that he experienced symptoms concerning being paranoid and having a sleeping disorder.  Id. at 55.  The ALJ asked plaintiff to describe his daily activities and then asked whether the medication and counseling he was receiving helped plaintiff.  Id. at 56.  Plaintiff answered "yes, sometimes I feel that I don't."  Id.  That was the extent of the ALJ's questions concerning symptoms and the ALJ then concluded his inquiry by asking

---

[9] In a footnote, defendant states his objection to the "clear and convincing" standard because it is inconsistent with the deferential substantial evidence standard but acknowledges that the clear and convincing standard is the requisite standard in the Ninth Circuit.  Dkt. 17 at 12 n.8.  As defendant notes, this court is bound to follow circuit law on this point.

about plaintiff's substance abuse.  Id. at 56–58.  The ALJ then heard testimony from plaintiff, directed by plaintiff's counsel, that plaintiff had trouble staying asleep every day and that plaintiff's medications sometimes helped but something did not.  Id. at 58.  Then, plaintiff described how sometimes he would have good days and at other times had bad days.  Id. at 60–62.

In his opinion, the ALJ found plaintiff's allegations to be inconsistent with the medical evidence of record in three areas.  First, he discounted plaintiff's statement that the stopped working for the U.S. Postal Service due to his mental impairments.  Id. at 27. In support of this, the ALJ cited his prior findings that plaintiff reported he quit for no apparent reason.  Id.  Second, the ALJ discounted plaintiff's testimony that he could not work because of his symptoms.  In support of this, the ALJ cited his prior finding that plaintiff's symptoms are well managed by medications and an October 2017 treatment note where Gilligan reported that plaintiff had one episode of psychotic symptoms "two months ago."  Id.  The ALJ also cited notes from Casa showing that plaintiff enjoyed playing basketball, spending time with friends, and peer interaction.  Id.  Third, the ALJ discounted plaintiff's testimony that his treatment does not help improve his symptoms. In support of this, the ALJ noted that "the medical evidence of record consistently indicates [plaintiff] reports, 'he has less mood swings, and no voices currently,' and that he stated he has 'greatly diminished symptoms when he regularly takes his medication.'" Id.

The foregoing demonstrates that the ALJ did not err by making a single general statement applicable to plaintiff's testimony.  See Brown-Hunter, 806 F.3d at 493. Rather, the ALJ attempted to rebut specific points with evidence from the record.  Cf. id. at 494 ("[The ALJ] simply stated her non-credibility conclusion and then summarized the medical evidence supporting her RFC determination.").  This does not mean, however, that the ALJ's opinion on this issue is free from error.  "[I]n determining whether there is substantial evidence to support the ALJ's finding, a reviewing court must consider both evidence that supports, and evidence that detracts from, the examiner's conclusion.  'We

1    cannot affirm the examiner's conclusion simply by isolating a specific quantum of

2    supporting evidence.'" Gallant v. Heckler, 753 F.2d 1450, 1455 (9th Cir. 1984) (quoting

3    Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975)).

4          Here, the ALJ erred by failing to consider evidence that supported plaintiff's

5    testimony and only considering evidence that detracted from his testimony.  For example,

6    the ALJ did not consider evidence from August and September 2016 that both Kim and

7    Gilligan reported.  For example, on September 12th, Kim noted that plaintiff reported that

8    "his voices were at a '7' out of 10 in severity and that he would like to go to the hospital if

9    they reach a '10.'"  AR 1363.  That same day, Gilligan reported that she received a call

10   from Casa staff, "who reported [plaintiff] was symptomatic over the weekend, and was

11   paranoid and required staff accompany him at night."  Id. at 1362.  Other evidence

12   supports plaintiff's testimony.  On September 15, 2017, a PREP group therapist noted

13   that plaintiff was not sleeping well and continued to struggle with depression.  Id. at 1437.

14   On October 4, 2017, Shepard reported that plaintiff denied symptoms of psychosis and

15   sleep disturbance, though she also noted that plaintiff "reported a 2-week period of

16   increase depression and intrusive thoughts around death of [his] brother."  Id. at 1434.

17         The issue here is not that the ALJ failed to cite any evidence; instead, the ALJ

18   ignored competent evidence in the record that tended to support plaintiff's contention that

19   he had good days and bad days.  See Gallant, 753 F.2d at 1456 ("Although it is within the

20   power of the Secretary to make findings concerning the credibility of a witness and to

21   weigh conflicting evidence, he cannot reach a conclusion first, and then attempt to justify

22   it by ignoring competent evidence in the record that suggests an opposite result."

23   (citations omitted)).  The reviewing court "must consider the entire record as a whole,

24   weighing both the evidence that supports and the evidence that detracts from the

25   Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of

26   supporting evidence."  Revels, 874 F.3d at 654.

27         The court is also mindful that "[r]eports of 'improvement' in the context of mental

28   health issues must be interpreted with an understanding of the patient's overall well-being

41

and the nature of [his] symptoms." Garrison, 759 F.3d at 1017.  "They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace."  Id.  The Ninth Circuit has warned that it is "error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."  Id.

Given this mandate combined with the selective citation of the medical evidence of record, the ALJ erred in rejecting plaintiff's testimony by clear and convincing evidence.

### 5.   Whether the ALJ Erred in Rejecting Third Party Statements

Plaintiff argues that the ALJ erred by rejecting lay witness testimony from plaintiff's mother and uncle without giving germane reasons for doing so.  Dkt. 16 at 21.  Defendant responds that the ALJ provided germane reasons to discount plaintiff's own testimony and also found that plaintiff's mother and uncle's statements to be duplicative of plaintiff's own testimony and inconsistent with the evidence of record.  Dkt. 17 at 15.

"[T]he ALJ may expressly disregard lay testimony if the ALJ 'gives reasons germane to each witness for doing so.'"  Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)).  "The Ninth Circuit has never found an ALJ's 'silent disregard of lay testimony about how an impairment limits a claimant's ability to work' to be harmless, and consistently reverses the Commissioner's decisions for "failure to comment on such competent testimony.'"  Stephens v. Colvin, No. 13-CV-05156-RS, 2014 WL 6982680, at *7 (N.D. Cal. Dec. 9, 2014) (quoting Stout v. Comm'r of Soc. Sec., 454 F.3d 1050, 1055–56 (9th Cir. 2006); and citing Van Nguyen v. Charter, 100 F.3d 1462, 1467 (9th Cir. 1996); and Lev v. Astrue, C 09–05074 RS, 2010 WL 3037261, at *6 (N.D. Cal. July 30, 2010)).

Here, the ALJ found third party functional reports and statements from plaintiff's mother and uncle to be unpersuasive for two reasons.  First, the ALJ stated that plaintiff's mother's functional report is "extraordinarily vague and duplicates claimant's own allegations."  AR 27.  In support of this conclusion, the ALJ cited a statement made by

1  both plaintiff and his mother that plaintiff does not drive because he does not have a

2  driver's license but other medical evidence of record indicates plaintiff's license was

3  suspended for driving with an open container.  Id.  Second, the ALJ discounted Latreesha

4  Young's third party statement of active psychosis as inconsistent with Gilligan's nearly

5  contemporaneous assessment of psychosis in remission.  Id. at 27–28.

6       The ALJ improperly discounted the third party lay testimony as conflicting or

7  inconsistent with plaintiff's medical record.  With regard to Latreesha Young's third party

8  functional reports, the primary reason cited by the ALJ was the discrepancy concerning

9  plaintiff's driver's license.  Plaintiff's mother's functional reports in this regard are limited.

10 In response to a worksheet that prompted her to explain why plaintiff does not drive, she

11 responded "no car & license."  Id. at 425 (dated July 1, 2015).  It is not clear that

12 Latreesha Young's response is inconsistent with the fact that plaintiff's license was

13 suspended, i.e., "no car & license" could mean that plaintiff had no license because it was

14 suspended.  The ALJ also found that the functional report conflicted with medical

15 evidence of record, which he did not specify other than citing exhibits in a parenthetical.

16 See Achakzai, 2020 WL 1450554, at *20 (finding that "[t]he ALJ did not provide a

17 germane reason tied to [a family member's] testimony, but rather offered a vague and

18 general conclusion that did not point to any specific inconsistencies between [the family

19 member's] testimony and the record").  Moreover, as discussed below, referring to

20 medical evidence of record is not an appropriate ground to reject competent lay

21 testimony.  Given the ambiguity of her statement concerning a driver's license and the

22 failure to cite specific medical evidence of record, the ALJ erred by failing to provide a

23 germane reason for discounting the third party functional report.

24      With regard to Latreesha Young's third party statement, the ALJ did not identify

25 any particular testimony that he discounted other than generally referring to her

26 "statements of active psychosis [is] inconsistent with Nurse Gilligan's nearly

27 contemporaneous assessment of psychosis in remission."  AR 27–28.  With the

28 exception of a single reference to Gilligan, the ALJ did not cite which treatment records

43

were inconsistent with specific portions of her testimony.  See Brown-Hunter v. Colvin, 806 F.3d 487, 494 (9th Cir. 2015) ("Because the ALJ failed to identify the testimony she found not credible, she did not link that testimony to the particular parts of the record supporting her non-credibility determination."); Burrell v. Colvin, 775 F.3d 1133, 1138 (9th Cir. 2014) (noting that an ALJ must "elaborate on which daily activities conflicted with which part of [the] testimony").  As discussed above, the ALJ failed to cite portions of Gilligan's treatment notes that support plaintiff's mother's testimony.

Even if the ALJ had been more specific in identifying treatment records, "a lack of support from the treatment records or clinical findings is not a proper basis for disregarding lay witness observations."  Peter T. H. v. Saul, No. 2:18-10680 ADS, 2020 WL 1441102, at *5 (C.D. Cal. Mar. 24, 2020) (citing Diedrich v. Berryhill, 874 F.3d 634, 640 (9th Cir. 2017)); see also Bruce v. Astrue, 557 F.3d 1113, 1116 (9th Cir. 2009) ("Nor under our law could the ALJ discredit [the witness's] lay testimony as not supported by medical evidence in the record.").  "The fact that lay testimony and third-party function reports may offer a different perspective than medical records alone is precisely why such evidence is valuable at a hearing."  Diedrich, 874 F.3d at 640.  Plaintiff's mother, while not a medical professional, had the opportunity to observe plaintiff in situations that his treating providers or the examining physicians were unable to see.  She has managed plaintiff's symptoms and has had experience in submitting third party functional reports because plaintiff previously had Social Security disability payments as a child.  See Dodrill v. Shalala, 12 F.3d 915, 918–19 (9th Cir. 1993) ("[F]riends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [his or] her condition.").   In sum, the ALJ erred by failing to provide germane reasons to reject plaintiff's mother's testimony.

With regard to plaintiff's uncle's testimony, the ALJ does not explicitly reference any portion of his declaration and instead generally refers to "[t]heir statements".  AR 27.  There is some tension in the controlling authority on the extent to which an ALJ must discuss each and every instance of lay testimony.  Generally, "in order to discount

competent lay witness testimony, the ALJ 'must give reasons that are germane to each witness.'" Molina v. Astrue, 674 F.3d 1104, 1114 (9th Cir. 2012) (emphasis added) (quoting Dodrill, 12 F.3d at 919); see also Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996) ("[L]ay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." (citing 20 C.F.R. § 404.1513(e); and Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987); and Dodrill, 12 F.3d at 919)). On the other hand, defendant cites Valentine v. Commissioner Social Security Administration, 574 F.3d 685, 694 (9th Cir. 2009), where the Ninth Circuit held that because "the ALJ provided clear and convincing reasons for rejecting [the claimant's] own subjective complaints, and because [the lay witness's] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting [the lay witness's] testimony." The court in Molina cited the foregoing excerpt from Valentine for the proposition that "[w]e have not, however, required the ALJ to discuss every witness's testimony on a [sic] individualized witness-by-witness basis." Molina, 674 F.3d at 1114. Thus, Valentine provides a narrow exception to the requirement to provide a germane reason to reject each witness.

That exception is not applicable here because this court has already determined that the ALJ failed to provide clear and convincing reason to reject plaintiff's own subjective complaints. See supra section B.4. Moreover, the Valentine exception should not be read too broadly. As the district court in Stephens noted,

> In Valentine, however, the ALJ did not silently reject witness testimony, but rather explicitly discounted the claimant's wife's testimony based on specific reasons already enumerated to discredit the claimant's testimony. Valentine is thus better understood as allowing ALJs to reject lay witness testimony only with express reference to reasons already put forth to reject similar testimony and "t[ying] the reasoning of their credibility determinations to the particular witnesses whose testimony they reject."

Stephens, 2014 WL 6982680, at *7 (quoting Valentine, 574 F.3d at 694). This approach is in accord with the clear requirements in cases like Nguyen and Dodrill that lay testimony is competent evidence and cannot be disregarded without comment. See

45

1    Nguyen, 100 F.3d at 1467; Dodrill, 12 F.3d at 919.  Plaintiff's uncle lived with him and

2    had the opportunity to observe plaintiff on a daily basis, which indicates why such

3    testimony is competent evidence.  Moreover, plaintiff's uncle disclosed that he "used to

4    work as a mental health professional, caring for people similar to Marcell."  AR 640.  The

5    ALJ erred by rejecting plaintiff's uncle's testimony.

6         The errors concerning third party testimony was not harmless.  "Where an ALJ

7    fails properly to consider competent lay testimony favorable to a claimant, the reviewing

8    court may not consider the error harmless 'unless it can confidently conclude that no

9    reasonable ALJ, when fully crediting the testimony, could have reached a different

10   disability determination.'"  Stephens, 2014 WL 6982680, at *7 (quoting Stout, 454 F.3d at

11   1056).  Here, plaintiff's mother testified that plaintiff "does not realize that something is

12   wrong with him.  He will act like nothing is wrong, and sometimes he doesn't want people

13   to know that he has schizophrenia."  AR 636.  She stated that, unless she reminds him,

14   plaintiff "will go long periods of time without showering, doing laundry, or maintaining

15   basic hygiene" and that plaintiff cannot manage his own money.  Id. at 636–37.  She

16   acknowledged that plaintiff has improved on treatment and has good days, but she also

17   stated that "he has not stopped hearing voices or experiencing severe, totally

18   overpowering paranoia."  Id. at 637.  If credited, plaintiff's mother's testimony could

19   support a finding that plaintiff is disabled.  For example, the vocational expert testified

20   that a hypothetical individual with plaintiff's RFC and attributes would not be able to find

21   gainful employment if that person missed two days of work per month.  Id. at 67–68.

22   Plaintiff's mother's testimony, if credited, indicates that plaintiff is frequently absent from

23   his employment and his medication does not prevent plaintiff from entirely hearing voices

24   or experiencing overpowering paranoia.

25        Similarly, plaintiff's uncle described "episodes of paranoia, anxiety, and strange

26   behavior" and includes examples of specific episodes, for example, "Marcell consistently

27   eats too much food, to the point where he vomits, despite having done this before."  Id. at

28   641.  This evidence could also impact the RFC assessment.

United States District Court
Northern District of California

United States District Court
Northern District of California

**6.      Whether the ALJ Erred in Assessing Plaintiff's RFC and Relying on the Medical-Vocational Guidelines**

Because the two issues are related, the court combines its discussion of the ALJ's assessment of plaintiff's RFC and his application of that RFC in step five.  With regard to the RFC assessment, plaintiff contends that the ALJ erred by failing to include all of plaintiff's limitations in his RFC and, further, that the RFC assessment was not supported by substantial evidence.  Dkt. 16 at 23.  Defendant argues that plaintiff's challenges to the RFC assessment are dependent on his other arguments, which defendant contends are supported by substantial evidence.  Dkt. 17 at 15.

With regard to step five, plaintiff argues that the ALJ erred by applying the Medical-Vocational Guidelines rather than relying on the vocational expert who testified at the hearing.  Dkt. 16 at 24–25.  Defendant responds that the Ninth Circuit has held that an ALJ need not consult a vocational expert when a claimant experiences moderate mental limitations, which defendant contends was the case here.  Dkt. 17 at 15–16.

At step three, the ALJ is required to determine a claimant's RFC and at step four, the ALJ applies the RFC to determine whether the plaintiff can perform the requirements of past relevant work.  An individual's RFC is what he can still do in a workplace setting despite his physical and mental limitations.  20 C.F.R. § 416.945.  At step five, the government has the limited burden of demonstrating that other work exists in significant numbers given a claimant's RFC, education, age, and work experience.  20 C.F.R. §§ 416.912(f); 416.960(c).

One means of demonstrating that other work exists in the Medical-Vocational Guidelines.  "The Medical–Vocational Guidelines are a matrix system for handling claims that involve substantially uniform levels of impairment."  Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2).  The Ninth Circuit has explained the mechanics of the Medical-Vocational Guidelines (also known as the "grids"):

The Guidelines present, in table form, a short-hand method for

47

> determining the availability and numbers of suitable jobs for a claimant. . . . The grids categorize jobs by their physical-exertional requirements and consist of three separate tables-one for each category: "[m]aximum sustained work capacity limited to sedentary work," "[m]aximum sustained work capacity limited to light work," and "[m]aximum sustained work capacity limited to medium work." Each grid presents various combinations of factors relevant to a claimant's ability to find work. The factors in the grids are the claimant's age, education, and work experience. For each combination of these factors, e.g., fifty years old, limited education, and unskilled work experience, the grids direct a finding of either "disabled" or "not disabled" based on the number of jobs in the national economy in that category of physical-exertional requirements.

Id. (alterations in original) (footnote omitted) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 200.00). "The ALJ may rely on the grids alone to show the availability of jobs for the claimant 'only when the grids accurately and completely describe the claimant's abilities and limitations.'" Id. at 1102 (quoting Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); and citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 200(e); and Desrosiers v. Sec. of Health & Human Servs., 846 F.2d 573, 577 (9th Cir. 1988)).

There are circumstances, however, when an ALJ may not use the grids. For example, "significant non-exertional impairments, such as poor vision or inability to tolerate dust or gases may make reliance on the grids inappropriate." Desrosiers, 846 F.2d at 577 (citations omitted). Further, "the grids are inapplicable '[w]hen a claimant's non-exertional limitations are sufficiently severe so as to significantly limit the range of work permitted by the claimant's exertional limitations.'" Hoopai v. Astrue, 499 F.3d 1071, 1075 (9th Cir. 2007) (alteration in original) (internal quotation marks omitted) (quoting Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)). "[T]he severity of limitations at step five that would require use of a vocational expert must be greater than the severity of impairments determined at step two, otherwise the two steps would collapse and a vocational expert would be required in every case in which a step-two determination of severity is made." Id. (citing Heckler v. Campbell, 461 U.S. 458, 461 (1983)).

Here, at step four, the ALJ determined that plaintiff could not perform his past relevant work as a postal mail carrier. AR 29. Then, at step five, the ALJ determined that

48

United States District Court
Northern District of California

1    plaintiff's ability to work at all exertional levels was compromised by non-exertional

2    limitations, but then found that "these limitations have little or no effect on the

3    occupational base of unskilled work at all exertional levels."  Id.  The ALJ applied the

4    Medical-Vocational Guidelines to find that plaintiff was not disabled.  Id.

5         As discussed above, the ALJ erred when he gave little weight to the opinions of

6    Gilligan, Shepard, and Franklin and Childs.  The ALJ's assessment of plaintiff's RFC is,

7    therefore, tainted with legal error by failing to incorporate the limitations and restrictions

8    identified in these opinions.  Further, the ALJ failed to consider any restrictions imposed

9    by patient's borderline intellectual functioning.  This impairment could also impose

10   additional limitations that the ALJ did not explore—especially if plaintiff's borderline

11   intellectual functioning compounded his ability to comprehend his own psychosis and

12   schizophrenia impairments.  Finally, the ALJ failed to properly credit plaintiff's testimony,

13   as well as the third party testimony of plaintiff's mother and uncle.  Therefore, to the

14   extent that the ALJ's assessment of plaintiff's RFC did not include these revised

15   limitations, the assessment was not supported by substantial evidence.

16        The erroneous RFC assessment also tainted the ALJ's determination whether

17   plaintiff's non-exertional limitations were "sufficiently severe so as to significantly limit the

18   range of work permitted by the claimant's exertional limitations."  Hoopai, 499 F.3d at

19   1075.  A revised RFC could result in non-exertional limitations that are sufficiently severe

20   such that the Medical-Vocational Guidelines were not applicable.

21        One final issue bears mention.  At the hearing, the ALJ received testimony from a

22   vocational expert.  The ALJ posed to the expert two hypotheticals.  First, he asked

23   whether (1) an individual with plaintiff's age and education; (2) holding the position of

24   postal mail carrier; (3) who had mental limitations such that he could respond "frequently"

25   to supervisors, coworkers, and the public; and (4) would be absent from work two days a

26   month would be able to hold the position of mail carrier.  AR 67.  The expert responded

27   that the hypothetical person would not be able to hold such a position because two days

28   a month would be too excessive "for the majority of employers in a competitive labor

49

United States District Court
Northern District of California

1  market." Id. at 67–68.  Second, the ALJ asked her "[c]an the hypothetical individual

2  perform any other work" to which the expert responded "no" for the same reason as her

3  first answer.  Id. at 68.  Despite this testimony, in his opinion, the ALJ failed to discuss the

4  expert's testimony and instead applied the Medical-Vocational Guidelines.  The only

5  instance where he mentioned the vocational expert was to identify plaintiff's past relevant

6  work. Id. at 29.

7        It is curious that an ALJ would solicit a vocational expert's opinion and then ignore

8  that opinion in arriving at his conclusion concerning a claimant's disability.  As the

9  foregoing case law reveals, there may be instances where the ALJ can resolve the step

10  five assessment solely by referring to the Medical-Vocational Guidelines.  Indeed, the

11  SSA regulations are permissive when discussing whether a vocational expert will be

12  used.  See 20 C.F.R. § 416.960(b)(2) ("We may use the services of vocational experts or

13  vocational specialists . . . to obtain evidence we need to help us determine whether you

14  can do your past relevant work, given your residual functional capacity." (emphasis

15  added)).

16        There is no controlling Ninth Circuit opinion on the issue of whether, having

17  solicited a vocational expert's opinion, an ALJ errs by subsequently ignoring that opinion.

18  One other district court in this district and a Tenth Circuit opinion have found such a

19  circumstance to be error.  Vasquez-Zarate v. Colvin, No. 4:12-CV-03843-KAW, 2014 WL

20  12482622, at *8 (N.D. Cal. Feb. 20, 2014); see also Campbell v. Bowen, 822 F.2d 1518,

21  1523 & n.6 (10th Cir. 1987) (stating that "[a]n administrative law judge may not ask a

22  vocational expert a hypothetical question based on substantial evidence and then ignore

23  unfavorable answers").  At the very least, the vocational expert's testimony constituted

24  lay evidence, which cannot be silently rejected.  As the Vasquez-Zarate court recognized,

25  "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is

26  competent evidence and therefore cannot be disregarded without comment."  2014 WL

27  12482622, at *8 (quoting Stout, 454 F.3d at 1056).  The court finds the Vasquez-Zarate

28  court's reasoning persuasive; an ALJ cannot ignore competent evidence from a

1   vocational expert, especially evidence that tends to support plaintiff's claim, without

2   comment.  Thus, the ALJ erred when he failed to discuss the vocational expert's

3   testimony in his step five analysis.

### 7.      Whether the Court Should Remand for Further Proceedings

5       "Remand for further administrative proceedings is appropriate if enhancement of

6   the record would be useful."  Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004)

7   (citing Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000)).  In contrast, under

8   Harman, the court may credit evidence that was rejected by the ALJ and remand for an

9   award of benefits "if (1) the ALJ failed to provide legally sufficient reasons for rejecting the

10  evidence; (2) there are no outstanding issues that must be resolved before a

11  determination of disability can be made; and (3) it is clear from the record that the ALJ

12  would be required to find the claimant disabled were such evidence credited."  Id.

13      Here, remand for further proceedings is appropriate in this instance.  The ALJ

14  failed to provide adequate reasons for the weight assigned to various opinions, including

15  those proffered by Gilligan, Shepard, and Childs and Franklin.  The ALJ also failed to

16  provide adequate reasons for rejecting plaintiff's testimony, his mother's testimony, and

17  his uncle's testimony.  Lastly, the ALJ failed to consider plaintiff's borderline intellectual

18  functioning as an impairment.

19      Such failures leave open various outstanding issues.  Such issues include how to

20  weigh the various medical opinions once the ALJ remedies the above referenced

21  deficiencies and how to weigh the lay testimony (once the ALJ reweighs the professional

22  opinions).  These revised opinions will then impact the ALJ's assessment of plaintiff's

23  RFC and the subsequent step five analysis.  These issues are evidentiary in nature and,

24  therefore, the ALJ is best situated to resolve them.

25      As a result, the court remands for further proceedings in accordance with this

26  opinion.  The ALJ must separately analyze and set forth adequate reasons for each

27  shortcoming identified above for each professional opinion.  Further development of the

28  record may also be helpful.  Following this additional analysis, the ALJ must reweigh

each such opinion to reach a conclusion on whether plaintiff is disabled.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED and defendant's cross-motion for summary judgment is DENIED.  The court REMANDS this action to the ALJ for further proceedings in accordance with this order.  This order adjudicates all pending motions and closes this case.

**IT IS SO ORDERED.**

Dated: June 29, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge